DANIEL S. McGUIRE AND CHARLOTTE F. McGUIRE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3348–63. Filed September 13, 1965.

*Walter J. Rockler* and *David R. Kentoff*, for the petitioners.
*James E. Caldwell*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1958, 1959, and 1960 in the amounts of $12,524.15, $12,979.85, and $10,760.72, respectively. The only issue is the amount allowable to petitioners in each of the taxable years as deductions for contributions of certain tangible personal property to a charitable organization.

FINDINGS OF FACT

The stipulated facts are found as stipulated and the facts reflected in the exhibits received in evidence are incorporated herein by reference.

---

Petitioners are husband and wife residing in Chicago, Ill. They filed joint Federal income tax returns for the years 1958, 1959, and 1960 with the district director of internal revenue, Chicago, Ill.

Chicago Wesley Memorial Hospital (hereinafter referred to as the hospital) was, during the years involved, an organization described in section 170(c)(2) of the Internal Revenue Code of 1954, and contributions to it are deductible to the extent provided in section 170 of the 1954 Code. The Angel Unit of the hospital raised funds for the hospital partly through public contributions.

During the years 1958, 1959, and 1960 the hospital had an agreement with Sheridan Art Galleries, Inc., of Chicago (hereinafter referred to as Sheridan) under which Sheridan, as agent for the hospital, would make appraisals of personal property donated to the hospital, sell said property, and remit the proceeds of sales, minus a commission of 25 percent of the sales price, to the hospital.

In 1958 Sheridan had been in the business of appraising property and selling property at auction for approximately 35 years. Its president, Shore, had had 20 to 25 years' experience in appraising and auctioneering personal property.

Prior to her marriage to Daniel S. McGuire, petitioner Charlotte McGuire was married to Rolly M. Cain, former president of Abbott Laboratories, Inc., now deceased. During that earlier marriage, Charlotte and her husband acquired many rare and expensive furnishings and art objects for their 14-room duplex apartment on North Lake Shore Drive in Chicago. Upon Cain's death the furnishings passed to Charlotte. After their marriage in 1949, petitioners continued to live in the same apartment and, from time to time, acquired additional good items of furniture and other homefurnishings.

In 1958 petitioners decided to break up housekeeping and move to a smaller furnished hotel apartment. They also contemplated taking an extended cruise and decided to dispose of much of their homefurnishings and some personal items of clothing. At the request of a friend who was a major benefactor of the hospital, and because of Charlotte's own personal ties with and desire to benefit the hospital, petitioners decided to donate most of their household furnishings, as well as other items of personal property, to the hospital. Petitioners were aware of the tax ramifications of contributing property to a charitable organization and decided to contribute the property over a 3-year period.

Petitioners contacted the hospital about the donations and, at the request of the hospital, Sheridan sent Shore to petitioners' apartment to appraise the property sometime in September 1958. Petitioners did not know Shore prior to this visit; Shore was acting for Sheridan as agent for the hospital and petitioners paid Sheridan no fees or charges.

Shore appraised all of the furnishings in the apartment and certain designated personal items. The appraisal, which took 2 days to complete, was based on an item-by-item examination of the property by Shore, during which he conferred with petitioners with respect to the cost of many of the various items.

Upon completion of his appraisal, Shore prepared an itemized written appraisal of all the property appraised. Soon thereafter all of the furnishings were removed from the apartment, a designated part thereof being taken to the Sheridan gallery for sale, a few items being taken to the hospital for use there, and the remainder being placed in storage. Petitioners paid the storage charges on the property while it was in storage.

On September 22, 1958, petitioners donated personal property to the hospital which had been appraised by Sheridan at an aggregate value of $20,125. This property consisted of two sets of rare leather-bound books, one being Agnes Strickland's "Lives of the Queens of England," fully illustrated with original engravings, appraised at $2,000, and the other being number 1 of 15 numbered copies of Charles Dickens' works, fully illustrated with engravings, a part of the collection of William Randolph Hearst, appraised at $9,000; a Steinway grand piano, appraised at $3,625; an RCA 21-inch color television set, appraised at $750; a 10-piece walnut bedroom suite, appraised at $2,500; a 113-piece set of Lenox china, appraised at $1,000 and a 154-piece set of Gorham sterling silver flatware, appraised at $1,250.

On January 15, 1959, petitioners donated personal property to the hospital which had been removed from the warehouse on instructions from petitioners and which had been appraised by Sheridan at an aggregate value of $21,945. This property consisted of three rather large air-conditioning units which were appraised at a total value of $1,200 and which were used at the hospital, a 19-inch television set appraised at $200, and 12 ladies' coats and fur scarves. All except one of the latter articles were made of expensive furs such as Russian sable, mink, and ermine and were appraised at values ranging from $750 to $4,500.

On January 11, 1960, petitioners donated personal property to the hospital which had been removed from the warehouse on instructions from petitioners and which had been appraised by Sheridan at an aggregate value of $20,003. This property consisted of 149 separate units of household furnishings including sterling silver services and other items of sterling silver, furniture, rugs, crystals, linens, chinaware, and metal and pottery vases. The appraised values of these items ranged from a high of $3,750 for a nine-piece Adam design satinwood with marquetry inlay twin bedroom suite to a low of $5 for several porcelain or silver pitchers and candlesticks. Some of these items were used at the hospital.

The personal property which petitioners donated to the hospital was, for the most part, of high quality and in good condition, and had been acquired by petitioners at a cost in excess of the appraised values.

Most of the articles were covered by two personal property floater policies, in the face amounts of $80,922.28 each, which had been placed with two insurance companies by their insurance agent to split the risk. These policies were 3-year policies issued in the latter part of 1956. Each policy insured unscheduled personal property in the aggregate amount of $9,000. This property consisted of categories such as silverware, linens, books, furniture, clothing, and other household furnishings, the aggregate values of which were approximated at $19,900. Each policy also covered scheduled jewelry to the extent of $65,562.28, having an aggregate value of $131,124.55, and scheduled furs to the extent of $6,360, having an aggregate scheduled value of $12,720. Several of the fur coats and scarves donated to the hospital were listed on the schedule attached to the insurance policies where they were assigned values approximating the values assigned thereto in the Sheridan appraisal.

With the exception of various items of personalty appraised by Sheridan which were retained and used by the hospital, all of the property which was donated by petitioners to the hospital during the years 1958, 1959, and 1960 was sold by Sheridan at unrestricted auction sales held not long after the respective dates of donation, upon the hospital's instruction to Sheridan to convert the property to cash as soon as reasonably possible. At these sales the property was all sold to the highest bidder with no minimum bid price nor minimum number of bids being required. Most of the bidders at these sales were wholesalers or dealers who were buying for resale. Sheridan attempted to get the highest price obtainable at these auction sales but it was known in advance that the sales prices obtained at unrestricted auction sales would represent on the average only 10 to 20 percent of the appraised values. If the items were held for sale to individual customers at retail it could be expected that they would sell for a higher percentage of the appraised values, probably 30 to 50 percent.

The property donated by petitioners to the hospital in 1958 was sold by Sheridan for an aggregate sales price of $3,015. On their 1958 income tax return petitioners claimed a charitable contribution deduction in the amount of $20,125 for property donated to the hospital.[1] In his deficiency notice respondent disallowed this deduction

---

[1] The stipulation of facts states that petitioners claimed a deduction in 1958 of $22,079 for property donated to the hospital, but it is obvious from the 1958 return that only $20,125 was claimed for this contribution, the $22,079 figure being the total deduction claimed for charitable contributions. The same error appears in the stipulation for each year. The amounts claimed by petitioners in each of the years were the values assigned thereto by the Sheridan appraisal.

to the extent of $17,110 "because it has not been established that the fair market value of the property contributed exceeded $3,015."

The property donated to the hospital by petitioners in 1959 which was sold by Sheridan [2] was sold for an aggregate sales price of $1,805. On their return for 1959 petitioners claimed a charitable contribution deduction in the amount of $21,945 for property donated to the hospital. In his notice of deficiency respondent disallowed this deduction to the extent of $20,140.

The property donated to the hospital by petitioners in 1960 which was sold by Sheridan [3] was sold for an aggregate sales price of $1,799.09. On their return for 1960 petitioners claimed a charitable contribution deduction in the amount of $20,003 for property donated to the hospital. In his notice of deficiency respondent disallowed this deduction to the extent of $18,203.91.

## ULTIMATE FACT

The fair market value of the personal property donated by petitioners to the hospital in 1958, 1959, and 1960 was $5,000, $5,200, and $5,000, respectively.

## OPINION

A deduction for charitable contributions is allowed under section 170(a), I.R.C. 1954.[4] We are not here concerned with the limitations provided in section 170(c) and it has been stipulated that petitioners donated personal property, in each of the years involved, which was appraised by Sheridan, to the hospital, which is an organization to which contributions are deductible under section 170(a). Thus our only issue is the amount of the deductions, concerning which the statute is silent, except to provide that a contribution will be deductible only if verified under regulations prescribed by the Secretary or his delegate.

---

[2] The three air-conditioning units appraised at a total value of $1,200 were used by the hospital and a lady's wool flannel coat appraised at $95 was apparently not sold.

[3] Fourteen units appearing on the appraisal of property contributed in 1960 having a total appraised value of $980 were apparently not sold by Sheridan. It is not clear from the record what happened to this property.

[4] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

Section 1.170–1(c), Income Tax Regs.,[5] insofar as applicable here, provides that if a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution, which is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither having any compulsion to buy or sell and both having reasonable knowledge of relevant facts. The regulation does go on to provide that if the property contributed is stock in trade of the donor the fair market value is the price he would receive if the property were sold in his usual market, which is of little relevance here except that it recognizes that sales prices and market values of the same property may vary in different markets.

Here petitioners claimed deductions in the amounts in which the donated items were appraised by Sheridan; although on brief they recognize that the appraisal amounts, being based on replacement values, may be somewhat in excess of fair market values. Respondent's determination of values and his contentions herein are based solely upon the prices realized from sale of the donated items at the unrestricted auction conducted by Sheridan, but respondent, modifying his original determination by concession on brief, recognizes that his determination of values of donated items does not take into account the value of items which were not sold at the direction of the hospital. Respondent, relying on the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), suggests that, with regard to those items not sold at auction, the Court make a reasonable estimate of fair market value based upon the evidence which has been adduced. This estimate, argues respondent, should be only a fraction of the amount for which the items were appraised by Sheridan.

Petitioners have the burden of proving that the items donated had a fair market value in excess of that determined by respondent, Rule 32, Tax Court Rules of Practice, but where competent evidence is

---

[5] Sec. 1.170–1. Charitable, etc., contributions and gifts; allowance of deduction.

(c) *Contribution in property*—(1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the lowest usual market in which he customarily sells, at the time and place of the contribution (and in the case of a contribution of goods in quantity, in the quantity contributed). The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, unless he sells only at retail in which event it is his retail customers. If a donor makes a charitable contribution of, for example, stock in trade at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of merchandise contributed would have been sold by the donor at the time of the contribution. * * *

introduced to rebut the presumptive correctness of respondent's determination, the issue becomes basically a question of fact "to be resolved from consideration and weighing of all the relevant evidence in the record." *Philip Kaplan*, 43 T.C. 663 (1965). This is particularly true where the basis for the factual conclusion implicit in respondent's determination has been demonstrated by petitioners to be erroneous.

Petitioners rely on the appraisals made by, and the testimony of, Shore, the president of Sheridan, the testimony of both petitioners concerning the condition, cost, and value of a number of the items donated, and the testimony of their insurance broker and the personal property floater policies he placed on their household furnishings and personal effects reflecting insurance values and costs considerably in excess of the sales prices.

Shore, who by experience should be a qualified appraiser of this type property, testified that his appraisals reflected his best judgment of the values of the various articles appraised, based on an item-by-item inspection of the property and discussions with petitioners as to the cost and length of time the items were held by petitioners. However, he admitted that his appraised values were nearer to replacement values rather than market values, and that petitioners could not expect to realize the full appraised values if the property was sold as used property on the open market. He testified that based on his experience only 10 to 20 percent of the actual value of property such as this could be realized at an unrestricted auction sale; he also testified that in his opinion the prices obtained at the auction sales did not represent the fair market value of the property here involved. He testified that if the property was held for sale at retail over a period of time to individual customers or buyers it could be sold for considerably more, probably 30 to 50 percent of the appraised values. He testified further that all of the property was in excellent condition. We do not accept Shore's appraised values as his opinion of the fair market values of the property but we do give some weight to his testimony that the auction prices did not reflect the fair market value of the property. We also give some weight to Shore's testimony as to the prices that one could expect to obtain if property of this kind were sold under different circumstances, that is, the prices that could be obtained for the property if sold on the open market to individual customers rather than wholesalers or people buying for resale purposes under circumstances where the seller was under no compulsion to convert the property into cash immediately.

Petitioners testified that they knew when they donated the property to the hospital that a large part of it would be sold, but that they did not know Shore and had had no contact with him before the appraisal

and had no control over, or anything to do with, the disposition of the property after it was donated to the hospital. They also described numerous items of the property donated, when they had been acquired, how long they had been held, and what petitioners had paid for them. We are convinced from our observation of these witnesses and from their testimony that most of the property donated was of high quality, was in good condition, and had a value to them, and other people who had similar tastes and enjoyed similar standards of living, far in excess of the prices for which the property was sold at the auction sales.

The insurance broker testified that the values assigned to the various items in the scheduled part of the policies were based on the best judgment of those concerned as to the actual value of the property listed, and that this was based in most instances on actual cost of the articles listed, discounted to some extent for use, wear, and tear. The values attributed to the unscheduled categories were the best judgment of those concerned as to the cost of replacing whatever items in the particular categories might be destroyed, damaged, or lost, and were not intended to reflect the entire value of all articles covered by these categories. The witness recognized that the values assigned in the insurance policies reflected the probable cost of replacing or restoring the items indicated to the insured. While the evidence is not too relevant to the issue before us it does indicate the quality and cost of some of the property with which we are concerned, its condition near the end of 1956, and, to some extent, the prices the insurance company, as a potential buyer, would be willing to pay to replace any of the property covered by the policies. In our opinion it is also entitled to some weight as evidence that the auction prices did not reflect fair market values. If the value assigned to the jewelry, none of which was donated to the hospital, is eliminated from the face values of the two policies, the remaining values do not equal the appraised values of the properties donated, but are considerably in excess of the auction sales prices of those properties.

Respondent, on the other hand, relies entirely on the auction sales prices in support of his position. As previously noted, respondent has allowed only the proceeds of the auction sales and has allowed no values for certain articles which were admittedly donated to the hospital, and used by it, such as the air-conditioning units, and respondent suggests on brief that the Court could make a reasonable estimate of the value of these items based on the evidence of record. While considerable weight must be accorded to actual sales prices in determining fair market values of the articles sold, see *Philip Kaplan*, *supra*, and the cases cited therein, it is nevertheless recognized that prices obtained at forced sales or public auction sales, or sales on restricted markets, are not always the best criterion of value, and are

certainly not conclusive, particularly where there is evidence that the property would sell for more under different circumstances. See *Heiner* v. *Crosby*, 24 F. 2d 191; *Doric Apartment Co.* v. *Commissioner*, 94 F. 2d 895, 897; *Stollwerck Chocolate Co.*, 4 B.T.A. 467, 471; *Cassidy Company, Inc.*, 11 B.T.A. 190; *Park Amusement Co.*, 15 B.T.A. 106. See also sec. 1.170–1(c), *supra*. Here the auction sales were made in a limited market and in a manner and under conditions over which petitioners had no control. Petitioners donated the property; they did not control its use or disposition thereafter. The hospital was not interested in the property, which it could not use, but wanted cash, which it could use. Holding the property for sale item by item to individual customers would have incurred trouble and expense. Consequently the hospital directed Sheridan to liquidate all the property as soon as reasonably possible. We do not think that a sale of property of the type here involved at auction, particularly at an "unrestricted" auction where the property is sold to the highest bidder with no minimum bid or number of bids being required, is necessarily indicative of the fair market value of the property, particularly where there is evidence that the property had an intrinsic value far in excess of the auction sales price and could have been sold under other circumstances at a considerably higher price. We are convinced by the evidence that the prices obtained at the auction sales did not reflect the fair market value of the property donated to the hospital and that under the particular circumstances in this case, in determining fair market value we should give consideration to the price this property would sell for if sold in the market and under circumstances in which property of this type and quality would normally be sold, [6] and that this should not limit us to consideration of the prices obtained at the auction sales.

---

[6] It is interesting to note that respondent's recently revised regulations on determining fair market value of property for Federal estate tax purposes, sec. 20.2031–1(b), Estate Tax Regs., as amended June 14, 1965, in T.D. 6826, contains the following language: "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market), includible in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles."

We also note the alacrity with which respondent has interpreted this amendment to the regulation to his agents where property is sold at public auction. See T.I.R. 737, issued June 16, 1965.

It may be argued that the hospital ultimately received for its use only the proceeds of sale and that this should be taken into consideration in determining the amount of the allowable deduction. But until, or unless, the law limits the deduction for charitable contributions to the value of the contributions *to the charity*, which we cannot find that it presently does, we must determine the amount of the deduction allowable by determining the fair market value of the particular property donated.

We have in the instant record rather detailed evidence concerning the character and condition of the items donated to the hospital. We also have evidence of the intrinsic value of the items to petitioners, as well as opinion evidence as to retail sales value. And, importantly, we have evidence of the original cost as well as the replacement cost of the items. Cost, of course, is cogent evidence of fair market value. *Guggenheim* v. *Rasquin*, 312 U.S. 254 (1941). Taking all of the foregoing factors into consideration and recognizing that sales of used personal articles and personal property of this sort will often not produce anywhere near its value or cost to the owners thereof, we have used our best judgment based on all the relevant evidence in this record to arrive at the fair market values we have found in our findings of ultimate facts. This must necessarily be an estimate, but as stated in *Cohan* v. *Commissioner*, *supra*, it "is not fatal that the result will inevitably be speculative; many important decisions must be such." Keeping in mind that the burden of proof is on the taxpayer we have found that the fair market values are much closer to the actual sales prices than to the amounts claimed as deductions by petitioners based on the appraisals.

In arriving at our factual conclusions we have fully taken into account, but deem inconclusive, the auction sales prices upon which respondent's determination is based and the amounts set forth in the Sheridan appraisals. All of the evidence of record, which we are of course obliged to consider and to weigh, as well as the basis of petitioners' claimed deductions and of respondent's determination does not lead us to the extremes of a spectrum; our finding of ultimate fact falls between the two positions originally assumed by the parties and abandoned by both on brief. In this regard our conclusion is analogous to that reached by the court in *Hamm* v. *Commissioner*, 325 F. 2d 934 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court, in which the Court of Appeals noted:

It is true that the record contains nothing pinned to this exact dollar and cents figure [of fair market value determined by this Court]. However, it is well settled that "Valuation * * * is necessarily an approximation * * *. It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence". Anderson v. Commissioner, 250 F. 2d 242, 249

(5 Cir. 1957), cert. denied 356 U.S. 950; Alvary v. United States, 302 F. 2d 790, 795 (2 Cir. 1962) ; Webster Investors Inc. v. Commissioner, 291 F. 2d 192, 194 (2 Cir. 1962) ; Commissioner v. Thompson, 222 F. 2d 893, 895 (3 Cir. 1955) ; Gloyd v. Commissioner, 63 F. 2d 649, 652 (8 Cir. 1933), cert. denied 290 U.S. 633, 54 S. Ct. 52, 78 L. Ed. 551; Mertens, Law of Federal Income Taxation, Volume 10, § 5903 (1963 cumulative supplement). Such is the situation here.

Respondent relies heavily on *Philip Kaplan, supra*, a similar case recently decided by this Court involving the issue of fair market value of property donated to the same hospital, and appraised by the same appraiser, in which we held that on the evidence there presented the appraisal by Shore was a sham and of no evidentiary value, and that there was no evidence to rebut respondent's determination that the auction sales prices were the best evidence of fair market value; and upon *Maurice L. Rivkin*, T.C. Memo. 1965–99, in which the *Kaplan* case was held to be controlling on the issue of fact presented because of the nearly identical set of facts. We have examined the record in these two cases and find that the only evidence of value offered by petitioners were the appraisals made by Shore and Shore's testimony with reference to his appraisals. Here we have other evidence of value as above indicated.[7] We also have Shore's testimony as to what he considered the property would sell for if sold under different circumstances and where the seller was under no compulsion to sell Shore was a candid witness at the trial of this case and while his appraisal was presumably made for tax purposes, we do not believe the values he arrived at were excessive for replacement or intrinsic values, which he admittedly was attempting to arrive at. While we cannot accept his appraised values as conclusive proof of fair market value we are not inclined to disregard the rest of his testimony which reflected his opinion of fair market value as a percentage of his appraisal figures. In fact, we have no reason in this case to disregard Shore's estimate of fair market value as a percentage of his appraised amounts. Shore was called as a witness by respondent, as well as petitioners, and it is clear from the record that both petitioners and respondent, in their examination of him as a witness, considered that he was capable of rendering an opinion as to fair market value of the donated items. Respondent, upon this record, cannot, and on brief does not, in any manner reflect upon Shore's ability to offer an expert opinion on the issue of fair market value.

---

[7] For example: McGuire testified that he paid $825 for the new model RCA color TV set, which was a wholesale price because of his employment, less than a year before it was given to the charity, and that its condition was as good as new at that time; Charlotte testified, supported by a bill of sale, that she paid $4,520 for a mink coat in November of 1956 which had not been worn more than six times when it was given to the charity; Charlotte testified that her husband bought the set of books "Lives of the Queens of England" from the Hearst collection at Marshall Field department store for $2,500 and that the books were kept in velvet cases, were oiled by Marshall Field once a year, and were in excellent condition.

Furthermore, the records in the *Kaplan* and *Rivkin* cases indicate that the properties there involved were of considerably different character than those here involved. The fact that the auction or wholesale price was considered to be the most persuasive evidence of the fair market value of the type of property involved in those cases does not necessarily make it the most persuasive evidence of the fair market value of the property involved in this case. Neither of those cases was intended to hold that the prices received at auction will always be determinative of fair market value. Consequently, we do not think our issue of fact here involved is controlled by those cases; nor do we think our finding here is inconsistent with our findings in those cases. That the issue of fair market value of property is one of fact to be determined on the facts and relevant evidence in each case, is well recognized by the Court in the statement from the opinion in *Kaplan* quoted at the beginning of this Opinion. In accord then with the authority of the *Kaplan* case in which we made findings of the fair market value of donated items as to which there were no sales figures, and with the contentions of the parties revising their original positions, and with full regard for all the evidence, the relevancy of which we have determined pursuant to the usual criteria for determining fair market value, we have made the ultimate findings set forth above.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

Mulroney, *J.*, dissenting: I respectfully dissent. The unquestioned acceptance of the definition of "fair market value," announced in the majority opinion, as being the price at which a sale would take place between a willing seller and buyer, makes the definition an established principle which should not be lightly disregarded. If this definition means anything it must prevent or put an end to any dispute over fair market value of pieces of tangible property when there was a voluntary sale of the very pieces of property at or about the exact time of inquiry. If the definition is to be applied, then surely the sale price must be considered the fair market value unless it be that the sale was not voluntary or either the seller or buyer was not "willing." The sale here was certainly voluntary. It was not a forced sale such as the bankruptcy sale involved in *Cassidy Company, Inc.*, 11 B.T.A. 190, or the sheriff's sale involved in *Park Amusement Co.*, 15 B.T.A. 106, relied on by the majority.[1] When the circumstances of the sale were

---

[1] The only other case relied on by the majority, which involved the fair market value of tangible personal property, is *Stollwerck Chocolate Co.*, 4 B.T.A. 467, which holds the fair market value of corporate property is measured by the price of its stock as established by an auction sale of the stock.

such that there were several possible purchasers and payment of the price was not induced by considerations other than the acquisition of the property purchased, we have willing buyers. I do not think it can be said the hospital was an unwilling seller merely because it preferred money instead of property. After all, that is the motivation behind most all sales.

It is true that the fair market value issue is one of fact and in the cases where there is no actual buyer or seller of the tangible property involved, the judgment must rest on the hazard of speculation. In such cases resort must be made to what is little more than a sheer guess as to what might be the price in an imagined sale transaction. I do not think that in a case such as this, where we have an actual seller and purchaser of the very pieces of property, under circumstances where neither was under any obligation or hard pressed to sell or buy, this Court should depart from the certainty of the sale price and measure tax deductions by predicting price decisions that mythical buyers and sellers might make. *Philip Kaplan*, 43 T.C. 663.

I rather think that if this were an estate tax case, the sale of a decedent's used wearing apparel and household furniture and equipment conducted by an experienced company that had been in the business of selling such property at auction for 35 years, would fix its fair market value for that tax. I would hold that, under the circumstances presented, the sale price would set the fair market value of the donated property for the amount of charitable contribution for deduction purposes.

RAUM, *J.*, agrees with this dissent.

---

PIERCE, *J.*, dissenting: I agree with the dissent of Judge Mulroney— to the effect that under the circumstances here present, the prices at which the several used properties were sold almost immediately following each of the three gifts thereof, constitute the best evidence of their respective fair market values on the respective valuation dates; and that such values should fix the amounts allowable to the petitioners as charitable deductions.

Also, it is my opinion that the proof of said sales prices is the only competent evidence of fair market values in the record herein. Of the four witnesses presented by petitioners, the only one who even attempted to express an opinion as to any *market values* for the several properties, was Jack Shore; and his itemized appraisals (which, as compared with the prices realized through sales made by his own company, were: For 1958, appraisal $20,125—sales price $3,015; for 1959, appraisal $21,945—sales price $1,805; and for 1960, appraisal $20,003—sales price $1,799.09), all were rejected by the trial judge

because, as Shore conceded, they were not even intended to reflect fair market values. Also, Shore's statement to the effect that if the properties were sold to individual buyers, "one by one * * * over an extended period," they might yield prices approximating from 30 percent to 50 percent of his appraisals, was not related to any particular items of the several properties contributed to the charity during the 3 years involved; and also he did not express any opinion that prices so obtained would reflect the fair market values of any of the particular properties as of the respective valuation dates.

Furthermore, after the Court rejected the only itemized appraisals presented by petitioners (being those of Jack Shore), it is my opinion that the Court was not justified as a matter of law, in making its own lump-sum and nonitemized determinations of fair market value by years, on the basis of general descriptions of the properties; and in thereby arriving at stated fair market values which are not only unsupported but considerably in excess of the realized sales prices. In the leading Court-reviewed case of *James Couzens*, 11 B.T.A. 1040, 1160, this Court said:

The Board and its members do not have, and are not expected to have, peculiarly expert knowledge upon the value of securities or any other of the multitudinous questions of fact which arise in the vast number of cases before it. *It can only decide the issues in any case by giving judicial consideration to the evidence properly in the record.* * * * The function of the Board should not be confused with that of the Commissioner of Internal Revenue. The Commissioner's determinations are in aid of his administrative duty to see that taxes imposed are assessed and collected, and there are no methods prescribed for the ascertainment of the facts upon which such administrative determination must be based. The Board is outside this organization with a duty to hear and decide as between the taxpayer and the Commissioner *upon a record publicly made in accordance with rules of evidence and procedure and subject only to appellate review by the courts of appeal.* Aside from general matters well recognized as subject to judicial notice, it has in any proceeding no official knowledge except as gathered from the evidence therein, and its *decision must reflect the preponderance of such evidence.* * * * We approach the problem of value, therefore, *not as experts* with the aid of the parties, but to judge impartially of the issue between conflicting interests, *in the light of all the evidence.*

[Emphasis supplied.]

Finally, the majority opinion is, in my view, in conflict with *Philip Kaplan*, 43 T.C. 663 (decided Feb. 17, 1965), and *Maurice L. Rivkin*, T.C. Memo. 1965–99 (decided Apr. 15, 1965). Both of these cases involved the fair market values of used properties donated to the same charity here involved, which were sold through the same sales organization, and which were appraised by the same witness, Jack Shore.

For all the foregoing reasons, I respectfully dissent.

MULRONEY, *J.*, agrees with this dissent.