Leroy H. Scheidelman and Hazel D. Scheidelman, Petitioners v. Commissioner.
Scheidelman v. Commissioner
Docket No. 6821-65.
United States Tax Court
T.C. Memo 1970-70; 1970 Tax Ct. Memo LEXIS 290; 29 T.C.M. (CCH) 303; T.C.M. (RIA) 70070; March 24, 1970, filed *290 In each of the years at issue, petitioners claimed certain cash charitable contributions which respondent disallowed in part as unsubstantiated. Petitioners donated certain tangible personal property consisting of house furnishings and marine equipment to a charitable organization in 1963 and deducted the alleged fair market value thereof as a charitable contribution. Respondent disallowed this deduction in its entirety. In 1962 and 1963, petitioners contributed certain real property to a charitable organization - a one-half interest in each year. Respondent contests the fair market value assigned to the building donated. 1. Held, petitioners made cash charitable contributions in excess of the amount allowed by respondent. 2. Held, further, the fair market value of the marine equipment determined, whereas petitioners did not establish the fair market value of the house furnishings. 3. Held, further, the fair market value of the building donated established to be in excess of that value determined by respondent. Richard O'C. Kehoe, 516 Mayro Bldg., Utica, N. Y., for the petitioners. Leon M. Kerry, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Taxable Year
Deficiency
1961
$5,706.52
1962
10,852.84
1963
13,256.71
Due to concessions made by the parties at trial and by stipulations, the only issues remaining for decision are: (1) the amount allowable to petitioners in each of the taxable years as deductions for cash contributions to charitable organizations; (2) The amount allowable to petitioners in 1963 as a deduction for contributions of certain tangible personal property to a charitable organization; and (3) The value of certain real property, one-half interest in which petitioners contributed *292 to a charitable organization in 1962, and the other one-half interest in which petitioners contributed to the same charitable oganization in 1963. Findings of Fact Some of the facts have been stipulated and are found accordingly. The facts reflected in the exhibits received in evidence are incorporated herein by reference. Leroy H. Scheidelman (hereinafter petitioner) and Hazel D. Scheidelman, husband and wife, filed Federal joint income tax returns for the calendar years 1961 and 1962 with the district director of internal revenue at Syracuse, N. Y. They filed a joint income tax return for 1963 with the district director of internal revenue, Buffalo, N. Y. At the time of the filing of these returns and of the petition herein, petitioners resided in Utica, N. Y. At the time of the trial, petitioner had been employed by P.F. Scheidelman & Sons, Utica, N. Y., for 43 years. The business, a wholesale grocery company, had been completely managed by petitioner since he was 16 years old. As manager, he handled all transactions including sales and personnel matters, and had witnessed the 304 company grow from a staff of two to a staff of approximately 60 employees. At the time *293 of the trial, P.F. Scheidelman & Sons had had gross sales of approximately $8 or $9 million over the previous 15 years. Petitioner was instrumental in setting up the bookkeeping system of the company in 1925. He was responsible for and understood all entries recorded in the company books. A total of $2,393 was deducted by petitioners as charitable contributions on their 1961 joint tax return. Of this total amount, respondent allowed $1,476 in his notice of deficiency and conceded an additional $58 at trial, making $859 the total amount of unsubstantiated cash charitable contributions at issue for 1961. On their joint income tax return for 1962, petitioners listed charitable cntributions in the total amount of $19,142, consisting of $2,324 in donations to various charitable organizations and a $16,818 item of real property identified as "i/2 Main Camp and 100 Ft. Frontage on Brantingham Lake Given to Chaminade Prep" (hereinafter Brantingham property or Brantingham realty). The Chaminade Preparatory is run by the Marianist Society, Inc., a religious organization (hereinafter Marianist Society). Due to the 30 percent limitation, petitioners deducted only $18,723.32 of their total *294 charitable contribution. However, petitioners filed an amended tax return for 1962 in which petitioners deducted the total $19,142 as a charitable contribution because they alleged an increase in their total income for 1962, which necessarily increased the charitable deduction for that year. Respondent allowed charitable deductions totaling $10,757 for 1962. Of this total, $9,500 was the value respondent assigned to the Brantingham property and $1,257 represented cash contributions. The remaining cash contributions were denied because they were unsubstantiated. Petitioners alleged charitable contributions totaling $22,941.50 on their joint tax return for 1963. Because of the 30 percent limitation, they deducted only $22,140.47. The claimed contributions consisted of $1,253.50 in cash, $4,070 in house furnishings and equipment, $2,800 in boats and motors, and $14,818 [1] for "i/2 Camp-Brantingham Lake." Petitioners filed an amended return for 1963 claiming a charitable contribution deduction of only $19,829.41 of the alleged $22,941.50 total charitable contributions. *295 The Commissioner allowed petitioners a total deduction of $10,433 for 1963, again consisting of $9,500 for the remaining half of the Brantingham property, and $933 [2] in cash contributions. In 1943 petitioners purchased eight acres of land together with four buildings thereon, located on a small island in Brantingham Lake for $8,000. Brantingham Lake is located in the Adirondack Mountains approximately 37 miles north of Utica, N. Y. At the time of the purchase the buildings were approximately ten to twelve years old. In December 1962, petitioners donated a one-half interest in a specified part of the island, together with a one-half interest in the main camp building located thereon, by deed to the Marianist Society. The other one-half interest in the same property was donated by deed sometime near Christmas 1963 to the same religious organization.
*296 Petitioners had not made any structural additions to the building in question between the time they acquired it in 1943 and the time they donated it to the Marianist Society in 1962 and 1963. No substantial renovations, such as new roofing or plumbing fixtures, had been made to the building in question during the period petitioners owned it. The building, which was serviced by a septic tank and a cesspool, was a frame structure with a stone and concrete foundation. It had a galvanized iron roof and painted clapboard siding. The interior of the building was finished. The building measured 64 feet long and 28 feet wide, with a front porch measuring 64 feet by 12 feet. In addition to the living room with two fireplaces, three bedrooms, a den, two bathrooms and a kitchen, there was a small basement under the kitchen area. Since the building had been constructed for 305 summer use and was, in fact, used approximately five months out of each year, it was not insulated. A construction engineer, Rodney Hamelin, inspected the building in the fall of 1962 and determined that certain repairs were needed, among which were painting the building, repairing the stairs and hatchways, making *297 needed repairs where there were some loose stones and cracking, and pointing some of the porch piers. Some of the concrete piers were flaking, which is usually an indication of poor original concrete, as often happens in remote areas where control of mix and use of untested sand can cause flaking. The engineer estimated the total cost of repairs to the building at $5,000. The value of one-half interest in the land donated in each of the years 1962 and 1963 was claimed by petitioners as $2,000. Respondent did not contest this land valuation. The replacement cost of the building at issue was determined by Hamelin in the fall of 1962 to be $34,858.78. Respondent did not contest that this figure represented the fair and reasonable value of the material, labor, overhead and general expenses that would be required to reconstruct the building. The building, as well as the personal property, such as house furnishings and equipment therein, was extensively used by petitioners, their three children, 16 grandchildren, and their guests. By deed dated January 8, 1963, petitioners also donated the furnishings and equipment in the building to the Marianist Society. A list of the items of *298 personal property contributed was attached to the deed. This schedule of items was prepared by petitioner sometime in the fall of 1962. In December 1962, petitioner placed valuations on each of the items donated. None of the articles was appraised by a third party knowledgeable in the valuation of such property. The furnishings and equipment were acquired by petitioners between 1943 and 1962. Some were new, while other items were used when acquired. For the most part, the age of the various items of personal property was unascertained. Petitioners did not keep any records regarding the date of purchase, the purchase price, and the condition of the furnishings and equipment which they donated to the Marianist Society. The Marianist Society did not provide petitioners with any type of receipt for these items. On their joint return for 1963, petitioners claimed a $2,800 deduction for contributing the following articles to the "Chaminade Preparatory" (Marianist Society): Item
Alleged Value
16' Chriscraft Chrysler Inboard
$2,300
18' Aluminum Canoe
200
14' Rowboat
130
3 i/2 Horsepower Outboard Motor
90
5 Horsepower Outboard Motor
40
7 i/2 Horsepower Outboard Motor 40
Total
$2,800
*299 This contribution was not executed by deed or any other evidence of conveyance, and no receipt was given petitioners by the donee. No records of any kind indicating the date purchased, the purchase price, and the condition of the boats and motors were kept by petitioners. Petitioners did not have an independent appraisal made of the donated boats and motors. Rather, petitioner placed a value on this marine equipment himself as he had done with the furnishings and household equipment he contributed in 1963. Except for the 3 i/2 horsepower outboard motor which petitioner's wife kept for her own personal use, the other boats and motors were used extensively by petitioners' children, grandchildren, and guests. Although he also made donations to other organizations, such as the Boy Scouts and the Red Cross, petitioner's contributions were primarily to religious organizations. It was petitioner's practice to make cash contributions to these various charitable organizations. In each year involved, some of petitioner's donations were evidenced by canceled checks, but a substantial amount of these contributions were made in currency and were in no way recorded by petitioner. [3] The *300 lists of alleged contributions attached to the joint returns for the years in question were prepared by petitioner from memory on or about April 1 of the year following each of the years at issue. Petitioner's wife, however, did 306 maintain complete and accurate records of the charitable contributions she made. Petitioners' income tax returns had been audited prior to the years at issue. The problem of lack of substantiation of certain deductions came up in these prior years. Early in 1962, petitioners were advised to keep better records of their charitable contributions. Opinion Petitioners made charitable contri2ut9ons in cash and personal property, part of which respondent disallowed because they were unsubstantiated. Respondent also contests *301 the value petitioners placed on a building which they contributed to a religious organization. Section 170(a)(1) of the Internal Revenue Code of 1954[4] provides, in part, as follows: (a) Allowance of Deduction. - (1) General rule. - There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. Even though we believe petitioner was a credible witness, we are faced with the proposition that there is a presumption of correctness which attaches to respondent's determinations and with the requirement of section 170(a)(1), as implemented by regulations, that charitable contributions, to be allowable, must be "verified." As a result, we have herein allowed petitioners some additional contributions based on the credible and uncontroverted, though uncorroborated, testimony of petitioner. However, we have denied other charitable deductions because petitioners have *302 not met even the minimum requirements of substantiation, despite the fact that the requirements of substantiation of deductions were brought to their attention early in 1962. 1. Cash Contributions The evidence shows that petitioner relied solely on his memory to compile the lists of alleged cash contributions attached to the joint returns for the years at issue. Petitioners claimed cash contributions of $2,393, $2,324, and $1,253.50 for 1961, 1962, and 1963, respectively. Respondent contends that petitioners are only entitled to deductions of $1,534, $1,257 and $933 for 1961, 1962 and 1963, respectively, because they failed to substantiate cash contributions of any greater amount. [5] However, from the testimony of petitioner as to the amounts he contributed to church on Sundays and as to the amounts he contributed to various other charities, we have concluded that petitioners' contributions for 1961, 1962 and 1963 totaled $1,770, $1,490 and $1,165, respectively. Cf. Cohan v. Commissioner 39 F. 2d 540 (C.A. 2, 1930).
2. Contributions *303 of Certain Tangible Property Petitioners deeded to the Marianist Society in 1963 personal property consisting of house furnishings and equipment contained in the main camp building on the Brantingham property. Attached to the deed was an itemized list of the items donated which was compiled by petitioner as a result of a visual inspection made sometime in the fall of 1962. Next to each article listed, petitioner indicated a value which he assigned to it. The total value assigned was $4,070. Section 1.170-1(c), Income Tax Regs., [6] provides that if a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the donation. The fair market value is, according to the regulations, the price at which the property would change hands between a willing buyer and a willing seller, neither having any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. *304 The fair market value of a price of property at a given date is a question of fact to be resolved from a consideration of all the relevant evidence in the record. Philip Kaplan 43 T.C. 663, 666 (1965). 307 Petitioners predicate their argument for a $4,070 valuation of the furnishings and equipment upon the fact that petitioner, being a homeowner and therefore having bought and sold this type of property all his life, had a fairly good idea of their value. While having no reason to doubt petitioner's testimony, we note that, with respect to the household furnishings and equipment, it was, at best, vague and inconclusive. Approximately $15,000 was spent, according to petitioner's testimony, to furnish and equip the house. It is noteworthy that petitioner testified that he could not recall which of the items had been purchased new and which had been purchased used. As for the used articles, his testimony revealed that he rarely attended sales of used furnishings in order to aid him in his valuation. In fact, other than the purchase of one or two used items, petitioner never bought any used furnishings since such items were usually purchased by his wife. We find, *305 based upon the meager evidence presented to us, that petitioners have not sustained their burden of proving the fair market value of the house furnishings and equipment donated and, therefore, the deduction is denied. Petitioners also claimed contributions in 1963 of certain boats and motors valued at $2,800. Respondent contends that petitioners have failed to substantiate and verify ownership and charitable contributions in 1963 of these boats and motors to the Marianist Society. Petitioner testified, and we hold, that he owned the boats and motors itemized on the joint 1963 tax return and donated them to the charitable organization indicated thereon. Petitioner was a credible witness, and we have no reason to discredit his uncontroverted testimony as to the donation of this marine equipment. Petitioner testified at length as to the cost, condition and age of the 16' Chriscraft with a Chrysler inboard motor, the 18' aluminum canoe, and the 14' rowboat. Petitioner purchased the all wood-Chriscraft with a 155 horsepower Chrysler inboard motor in 1958 or 1959 for approximately $3,200. The 18' aluminum canoe was acquired by petitioner new in 1956 or 1957. At the time it was donated, *306 the canoe was in very good condition. The rowboat, which cost about $190, was built for petitioners at about the same time that they acquired the canoe. Petitioner's testimony, while not revealing the cost and age of the three outboard motors that he and his wife donated, did enlighten us as to their general condition. The 3 1/2 horsepower motor was in vary good condition, [7] whereas the 7 i/2 horsepower and 5 horsepower motors had been extensively used prior to the time they were contributed to the Marianist Society. With full regard for all the relevant evidence which is before us, we hold that the aggregate fair market value of the marine equipment at the time it was contributed by petitioners was $2,135. Daniel S. McGuire, 44 T.C. 801 (1965); Philip Kaplan, supra.
3. Contribution of Brantingham Realty Petitioners donated a one-half interest in the Brantingham property, consisting of a camp building and land, to the Marianist Society in 1962. This interest was valued by petitioners at $16,818, of which $2,000 was assigned to the land. In 1963, the other one-half *307 interest in the Brantingham property was given to the same organization and a value of $2,000 was again assigned to the land. [8] Respondent accepted the $2,000 valuation of the land for each year and conceded at trial that the special nature of the realty and the lack of sales of comparable property in the area did not lend itself to the market data approach nor to the capitalization of income approach of determining the fair market value of the building donated. Therefore, respondent accepted petitioners' reproduction cost less depreciation method of arriving at the fair market value of the building on the Brantingham property. Rodney Hamelin, a construction engineer employed by petitioners, inspected the Brantingham realty in 1962 and determined that the cost of reconstructing the building was $34,858.78, which determination was also accepted by respondent. The question before us is the proper depreciation factor to be applied to the cost of reproduction in order to arrive at the fair market value of the building. The Commissioner determined that the reasonable *308 life of the 30-year-old building was approximately 50 years, and he then 308 applied a flat rate of 2 percent a year, resulting in a depreciation factor of approximately 60 percent. Petitioners, however, applied a 15 percent depreciation factor resulting in a rate of one-half of one percent a year, the determination of which was explained in detail at trial by Hamelin. According to Hamelin, he made a very thorough inspection of the building in 1962 and was thereby able to determine the repairs necessary to restore the building to "first-class condition." [9]
Hamelin estimated the total cost of these repairs at $5,000, which sum represented approximately 15 percent of the reproduction cost of the building. It was upon this basis that he applied a 15 percent depreciation factor to the building for purposes of determining its fair market value as a charitable contribution. We have held that reconstruction cost less actual depreciation sustained is important evidence of *309 value and has therein important elements to prove either market value or actual value. However, we have recognized that depreciation is to be concretely determined by inspection and that factors such as actual use, condition and age are all relevant in arriving at an appropriate rate of depreciation. The Kinsman Transit Co., 1 B.T.A. 552 (1925); Rockford Malleable Iron Works, 2 B.T.A. 817 (1925). See also Eugene E. Hinkle, 47 B.T.A. 670 (1942). It must be kept in mind, however, that value is a question of fact and is often affected by factors that are not dependent on cost or depreciation. Therefore, we are not irrevocably bound to a rule of reproduction cost less depreciation. Georgia Ry. v. R.R. Comm., 262 U.S. 625 (1923), but rather we will accord this method the important role it deserves as a guide to the fair market value of the building donated. The Kinsman Transit Co., supra. Hamelin testified that the general condition of the building was very good and that aside from the fact that some of the concrete piers were flaking, which is an indication of poor original concrete, there was no indication of any structural *310 defects in the building. The extent of poor concrete in the concrete foundation was, according to Hamelin, very small, approximately one-tenth of one percent. He also testified that a properly maintained building could have a useful life of indefinite duration. Bearing in mind that valuation is necessarily an approximation, our examination of all of the evidence in the record ind our careful weighing thereof leads us to conclude that we can accept neither respondent's nor petitioners' position regarding the fair market value of the building. We find the reasonable life of this building to be 60 years; and in view of the testimony regarding the wear, age and obsolescence of the structure, we are persuaded to apply a 50 percent depreciation factor in reduction of the cost of reproducing the building. The resulting figure, we feel, represents the fair market value of the house at the time petitioners deeded it to the Marianist Society. In order to reflect the concessions made by the parties and the conclusions reached herein, Decision will be entered under Rule 50. Footnotes
1. Although petitioners deeded a one-half interest in the Brantingham realty to the Marianist Society in 1962 and the remaining one-half interest therein in 1963, there is nothing in the record to explain why they claimed a charitable contribution deduction of $16,818 for the realty deeded in 1962, but only $14,818 for the realty deeded in 1963.↩
2. At trial respondent conceded $732.50 of the $1,253.50 total cash contributions claimed by petitioners in 1963. In addition, we note that respondent allowed petitioner's wife $200.50 in cash contributions, although she had only claimed $190.50 in cash charitable donations on the joint return for 1963. This makes the total allowed $933.↩
3. Respondent has allowed $78 of unsubstantiated contributions in each of the years involved. This was allowed apparently under the authority of the New York District Guideline which authorizes an allowance of up to $78 in charitable deductions on a joint return where there is no documentation of cash contributions. The Guideline allows $1 per week for cash contributions to church and 50 cents a week for other cash contributions.↩
4. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
5. We have already noted that respondent did allow $78 of unsubstantiated cash contributions for each of the years in question.↩
6. § 1.170-1. Charitable, etc., contributions and gifts; allowance of deduction. * * * (c) Contribution in property - (1) General rules. If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *↩
7. At trial petitioner testified: "The 3 i/2 outboard motor * * * was like new."↩
8. Petitioners only deducted $14,818 with respect to this donation on their 1963 return. See footnote 1, supra.↩
9. As to Hamelin's definition of "first-class condition," the following testimony is relevant: Q. When you say first-class condition, what do you mean? A. I mean good as new. Not new, but good as new.↩