ADOLPH POSNER and FLORENCE POSNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Posner v. Commissioner
Docket No. 6831-73.
United States Tax Court
T.C. Memo 1976-216; 1976 Tax Ct. Memo LEXIS 186; 35 T.C.M. (CCH) 943; T.C.M. (RIA) 760216; July 8, 1976, Filed Howard Weitz and Martin M. Frank, for the petitioners. Alan J. Garfunkel, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the Federal income tax of petitioner Adolph *187 Posner for taxable year 1969 and of petitioners Adolph and Florence Posner for taxable year 1970 in the amounts of $4,012.21 and $2,419.83, respectively.The only issue for decision is the valuation of a painting for purposes of determining the amount allowable to petitioners as a charitable deduction under section 170. [1]
FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Adolph Posner filed a Federal income tax return as a single individual for calendar year 1969. Petitioners Adolph Posner and Florence Posner, husband and wife, filed a joint Federal income tax return for calendar year 1970. Both returns were filed with the District Director of Internal Revenue, Manhattan, New York. At the time the petition in this case was filed, petitioners resided in New York, New York. Adolph Posner (hereinafter referred to as "petitioner") is an ophthalmologist who for a number of years has taken an interest in art. Approximately twenty *188 years ago, petitioner purchased a painting at an auction for a nominal amount. The painting was large, being 46 inches by 59 inches. The painting hung in petitioner's office until, in 1969, he decided to move to a new office, which did not have walls large enough to accommodate the painting. Petitioner's son-in-law had arranged a family donation to the art gallery of the State University of New York at Binghamton. He suggested to petitioner that the gallery might be interested in the painting and arranged for petitioner to meet with the museum's director, Mr. Michael Milkovitch. When he viewed the painting, Mr. Milkovitch indicated that the gallery was interested in it, and petitioner agreed to donate the painting to the gallery unconditionally. The painting was accepted on behalf of the gallery by the Foundation of the State University of New York at Binghamton, Inc., in 1969. The Foundation was an educational institution, donations to which were deductible under section 170(b)(1)(A)(ii). After the painting was cleaned and restored, it was placed on exhibit in the gallery. Mr. Milkovitch recognized the painting as the work of Antonio Zanchi, a Venetian artist who lived *189 from 1631 to 1722, and who painted in the Baroque style. The subject matter of the painting is "Death of Seneca." Seneca was a first century Roman orator, philosopher, playwrite and statesman who served as tutor and later adviser to Nero. His suicide, ordered by Nero, was a popular subject for seventeenth century artists. The painting was in relatively good condition, taking into account its antiquity. Restoration in the form of overpainting comprised approximately twenty percent of the total surface of the painting. Mr. Milkovitch wrote an article on the subject of recent acquisitions by the art gallery which was published in the winter 1970 issue of the Art Journal, a scholarly publication emphasizing works in college art museums. Among the paintings discussed in the article was the Zanchi painting. In his submission to the magazine, Mr. Milkovitch included several black-and-white pictures of the paintings recently acquired by the gallery. The magazine asked him to provide a color photograph of the Zanchi painting, which was used on the cover of the magazine. Mr. Milkovitch considered the painting to be valuable and sent a copy of the color photograph to Mr. Clyde Newhouse, *190 treasurer of the Newhouse Galleries in New York City, for his appraisal.Mr. Newhouse spent five or six days doing research on Zanchi. In the course of his research, Mr. Newhouse initially interpreted the subject of the painting to be that of "The Good Samaritan." He later determined that the proper subject was the "Death of Seneca." He confirmed Mr. Milkovitch's attribution of the painting to Zanchi. In a letter dated December 15, 1969, Mr. Newhouse wrote that the Zanchi painting was well known to him, being an "important and wellconserved example by this rare Venetian master." [2] He valued it at $15,000. The letter gives the title of the painting as "The Good Samaritan," which has been struck out and replaced by "Death of Seneca." On October 19, 1971, a painting attributed to Antonio Zanchi entitled "The Holy Family" was sold at auction by Finarte, Milan, Italy. The sale price was $2,592. According to the 1972 edition of International Auction Records, in which the sale was reported, the *191 painting sold was listed as an authentic Zanchi. In his 1969 Federal income tax return, petitioner claimed a charitable deduction of $15,000 for the donated painting. Of this amount $4,419 was carried forward and reported as a deduction on petitioner's 1970 return. At respondent's request, the color photograph of the painting was submitted to the Commissioner's Art Advisory Panel, which consisted of twelve eminent persons in the field of art. Dealers, museum directors and art history professors were represented on the panel. The consensus conclusion of the panel was that the painting had a value of $5,000. Accordingly, respondent disallowed $10,000 of the $15,000 deduction. ULTIMATE FINDING OF FACT The fair market value of the painting donated by petitioner to the art gallery in 1969 was $5,000. OPINION In 1969 petitioner donated a painting by Antonio Zanchi to the university art gallery of the State University of New York at Binghamton. Zanchi was a Venetian painter in the Baroque style. The gallery had the painting appraised by Mr. Clyde Newhouse, who valued it at $15,000. Petitioner thereupon claimed a charitable deduction for 1969 of $15,000, allowable under *192 section 170(a)(1). [3]Respondent's Art Advisory Panel determined the value of the painting to be $5,000, whereupon respondent disallowed the deduction to the extent of $10,000. It is undisputed that a donation was made to an educational institution qualifying as a charitable organization for purposes of section 170. The only question for our determination is the amount of the deduction. If a contribution is made in property other than money, the amount of the charitable deduction allowed is the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, where neither is under any compulsion to buy or sell and both are cognizant of the relevant *193 facts. Section 1.170-1(c)(1), Income Tax Regs. The fair market value of the same property may vary, depending on the market in which the property is sold. Daniel S. McGuire,44 T.C. 801, 806 (1965). Petitioner presented testimony by three experts at trial, Mr. Milkovitch, Mr. Newhouse and Dr. Gustine. Scaglia, a history of art professor at Queens College in New York. Only Mr. Newhouse testified as an expert in the valuation of paintings, although both Mr. Milkovitch and Dr. Scaglia were conceded to be expert with regard to determination of the authenticity of the painting. Mr. Milkovitch is an art scholar who has written a number of articles concerning art. His specialty is Italian art, including the Baroque period. He has a master's degree in art history. At the time of the donation, he was director of the university art gallery and professor of art history at the State University of New York, at Binghamton. Mr. Milkovitch determined that the painting was an authentic Zanchi. He is familiar with the work of Zanchi, having viewed eighty to one hundred of Zanchi's paintings, mostly in Europe. His determination as to authenticity is unquestioned. He stated *194 that the painting "Death of Seneca" is one of the best works of Zanchi. Dr. Scaglia is a professor of history of art at Queens College, having served at that institution for seventeen years. She has a doctorate in Italian art from the Institute of Fine Arts of New York University. She has taught Baroque art and is familiar with the reputation and works of Zanchi. She noted that Zanchi enjoyed an excellent reputation among his contemporaries. Dr. Scaglia stated that she believed "Death of Seneca" to be an excellent example of Baroque painting. She stated that the painting had not been restored to any greater extent than other paintings of the same age. She had done research on Zanchi and had found reference to "Death of Seneca," which was described as one of Zanchi's best works. Mr. Newhouse served as President of the Art Dealers Association at the time of trial. As treasurer of the Newhouse Galleries, he buys and sells pictures and does research work in connection with the sale of old master paintings. He is familiar with the Italian Baroque period of art. He has thirty-six years' experience in the valuation and sale of old master paintings and has valued thousands of *195 paintings over this period. Mr. Newhouse testified that the procedure by which he initially valued the Zanchi painting, by use of the color photograph, was the accepted normal procedure used in valuing paintings of this type. Mr. Newhouse stated that he relied in part on representations by Mr. Milkovitch as to the quality of preservation of the painting in making his initial evaluation in 1969. In viewing the painting in Court, in both natural and ultraviolet light, Mr. Newhouse confirmed that the painting was in a "well-conserved" state. He estimated that the painting was twenty percent restored. He further stated that the areas of restoration were not important to the painting and that restoration on such a scale was typical of paintings two to three hundred years old. Mr. Newhouse testified that the painting was worth at least $15,000 at the time of trial and probably more. He based his valuation on the quality of the painting, the small amount of restoration, and the reputation of the artist. He stated that he had sold paintings by lesser artists for $10,000 and $12,000. He noted that Zanchi was known for his teaching. The value of Zanchi's paintings was enhanced, in *196 Mr. Newhouse's opinion, by the influence Zanchi exerted on other painters, such as the Italian master Tiepolo, whose paintings Mr. Newhouse had sold for over $200,000. Respondent contends that Mr. Newhouse's testimony should be entitled to little weight, because in the letter he wrote to Mr. Milkovitch in December 1969 giving his evaluation of the painting, he incorrectly described the subject of the painting to be "The Good Samaritan." In the letter, that incorrect designation was crossed out, and "Death of Seneca" was substituted. Mr. Newhouse explained that he originally thought the subject matter to be that of "The Good Samaritan." He realized upon further research that the painting portrayed Seneca's death. The mistake did not mean, as respondent suggests, that Mr. Newhouse at first valued the wrong painting. Respondent points to a painting entitled "The Good Samaritan" and attributed to Zanchi, which was sold at a 1970 auction by Sotheby & Company for $720. As pointed out by Mr. Milkovitch and Mr. Newhouse, the attribution was to the school of Zanchi, rather than to Zanchi himself. Furthermore, Mr. Newhouse stated that he did not know of the existence of the painting *197 called "The Good Samaritan." He merely gave that name to the painting because he perceived that to be the subject matter of the painting. Both "The Good Samaritan" and "Death of Seneca" were common subjects of the Italian Baroque painters. On the other hand, Mr. Newhouse's reference to the incorrect subject of the painting in his letter to Mr. Milkovitch suggests that the letter was composed and typed before Mr. Newhouse had completed his research, inasmuch as he testified that his research had led him to the conclusion that the subject matter of the painting was "Death of Seneca." Consequently, the $15,000 valuation given the painting in the letter suggests that Mr. Newhouse was predisposed to value the painting in such an amount. Mr. Victor D. Spark, an art dealer and appraiser, appeared as a witness for the respondent. Mr. Spark has forty years' experience in making appraisals. He is a member of the American Appraisers Association. He has appraised art collections for insurance companies, art museums, private collectors and government agencies. He is not a member of the Commissioner's Art Advisory Panel. Although Mr. Spark has purchased or sold hundreds of Baroque paintings *198 for his own account, he testified that he had never heard of Antonio Zanchi until he was called upon to value the painting. He stated that this was not unusual, inasmuch as Zanchi is not a well-known artist. In his research, he found that Zanchi was an "anachronistic" painter who painted in the Baroque style long after that style had lost its popularity. He found that Zanchi was not the equal of some of the artists he may have influenced as a teacher. Mr. Spark examined "Death of Seneca" under an ultraviolet light and expressed the opinion that the area of restoration was approximately fifty percent. He was also able to discern a substantial amount of overpainting without use of the ultraviolet light. He concluded that the painting was in such a poor state of preservation that its value would be adversely affected. Mr. Spark also stated that the composition of the painting was unpleasant. He cited as examples the relative size of the heads of the subjects and the awkward positioning of the figures. He stated that the painting would be more valuable to scholars than to collectors. Taking into account the aesthetic value and condition of the painting, Mr. Spark determined *199 that the value of the painting was $1,500. He explained the discrepancy between that figure and the $5,000 valuation placed on the painting by the Commissioner's Art Advisory Panel by the fact that the painting was in a very poor condition, which would not be apparent to the panel from examination of the photograph. He stated that if the painting had been only twenty percent restored, he would value it at about $4,000 to $4,500. The only evidence offered by either party of a comparable sale of an authentic Zanchi painting was the auction sale of "The Holy Family" at a price of $2,592 in 1971. With respect to value, the Court is thus faced with an opinion by petitioner's expert, who placed a valuation of $15,000 on the painting, ostensibly prior to having made an in-depth study of the subject; the opinion of respondent's expert, who placed a value of $1,500 on the painting on the assumption that the subject was in poor condition and has been overpainted to the extent of fifty percent; and evidence that a painting by Zanchi entitled "The Holy Family" had been sold at auction for a price of $2,592 in 1971. In the face of such conflicting evidence, the Court is unable to find *200 as a fact that the value of the painting exceeded $5,000. See Philip Kaplan,43 T.C. 663 (1965). [4] Accordingly, the respondent's determination must be sustained. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The term "rare" must be taken to refer to the fact that there was only one other known Zanchi painting in the United States. However, Zanchi paintings were not rarities in Europe.↩
3. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. -- (1) General rule. --There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * *↩
4. See also Charles A. Weil,T.C. Memo. 1967-78↩.