**SANTA FE PACIFIC RAILROAD COM-PANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 61 C 615.**

United States District Court
N. D. Illinois, E. D.

Dec. 29, 1965.

Floyd Stuppi, Chicago, Ill., for plaintiff.

Edward V. Hanrahan, U. S. Atty., A. L. Biggins, Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PERRY, District Judge.

This cause having been tried by the court without a jury, and the court having considered the pleadings, the stipulations of facts, together with exhibits attached thereto, the exhibits introduced at. the trial, the testimony of witnesses and the oral arguments and briefs of counsel, finds the facts and states the conclusions of law as follows:

### FINDINGS OF FACT

1. Plaintiff, Santa Fe Pacific Railroad Company, hereinafter referred to as the "taxpayer", is a corporation organized and existing under and by virtue of an Act of Congress, approved March 3, 1897, 29 Stat. 622, and maintains its principal office and place of business at 80 East Jackson Boulevard, Chicago 4, Illinois. Taxpayer's Federal income tax returns for the calendar years 1951 to 1953, inclusive, were filed with the Collector of Internal Revenue at Wichita, Kansas, hereinafter referred to as the "Collector".

2. At all times material to the issues herein, all of Taxpayer's capital stock has been owned by The Atchison, Topeka and Santa Fe Railway Company, hereinafter referred to as "Atchison".

3. During the taxable years in question, taxpayer owned mineral rights in certain lands located in the States of Arizona and New Mexico. Taxpayer, however, did not own the surface rights to all such lands.

In the spring of 1950, uranium-bearing ores were found on Section 19, Township 13 North, Range 10 West, hereinafter referred to as Section 19 (Haystack), located in McKinley County, New Mexico. The mineral rights in Section 19 (Haystack) were owned by taxpayer. The

surface rights were owned by one Berry-hill.

4. The mineralized outcropping on Section 19 (Haystack) contained a yellow mineral, later identified as tyuyamunite. It occurred in a dark gray limestone outcropping near the top of a red sandstone mesa or bluff. The limestone formation, known as Todilto limestone, dipped toward the north and was covered by an overburden of earth varying in depth.

5. In September, 1950, T. O. Evans, Chief Mining Engineer of the Atchison, was assigned to investigate this occurrence. During September and October, Evans found that the total length of exposed limestone outcroppings extended about 12½ miles, of which 8½ miles occurred on lands in which the mineral rights were owned by taxpayer. His investigation disclosed that mineralized outcroppings were present not only on Section 19 (Haystack) but also on Section 13, T. 13 N., R. 11 W., Section 23, T. 13, R. 10, Section 25, T. 13, R. 10, and Section 31, T. 13, R. 9, hereinafter referred to as Sections 13, 23, 25, and 31, respectively.

6. In the latter part of October, 1950, Evans reported that his preliminary investigation warranted further exploration. On November 13, 1950, F. G. Gurley, President of both the Atchison and taxpayer, authorized Evans to proceed with further exploration of the occurrences already found, and to explore the entire Todilto formation from Cubero, New Mexico, to Gallup, New Mexico, a distance of 90 miles, using geiger counters. Prospecting with geiger counters disclosed that the strongest showings of radioactivity occurred in six sections approximately twenty miles northwest of Grants, New Mexico, in the immediate area of the original occurrence. Geiger counter and scintillometer readings disclosed the existence of radioactive materials.

7. On December 11, 1950, Gurley and members of his staff met with Evans to decide upon a program of detailed investigation of the uranium occurrences. The surface exposure of radioactive tyu-

yamunite ore, the shallow overburden, and the accessibility of Section 19 (Haystack) resulted in the choice of that section for detailed exploration. Evans recommended the adoption of the following program:

(1) Establishment of horizontal and vertical control with reference stakes set on North, South, East and West lines at 100 foot centers.

(2) Removal of overburden to top of Todilto limestone at 100 foot centers with bulldozers.

(3) Vertical control on bedrock surface of Todilto limestone.

(4) Test pitting through the Todilto limestone on 100 foot centers to the underlying Entrada sandstone, followed by crushing, sampling and assaying of all test pit material as obtained from each two feet of vertical section.

(5) Drill, blast and sample entire rim outcrop four feet back of the rim at 10 foot intervals. (Secondary uranium mineral is soluble and this procedure was necessary to obtain an unweathered face back of the outcropping.)

(6) Installation of laboratory equipment to furnish radiometric and chemical determinations of drill hole and test pit samples.

This program was approved by Gurley and his staff on December 11, 1950. Similar programs were subsequently adopted for Sections 13, 23, 25 and 31.

8. At the same meeting Evans was directed to submit regular reports to Gurley outlining the progress of the program which had been authorized.

9. On December 14, 1950, Gurley issued a report to Atchison stockholders reviewing the investigation and exploration accomplished to that date, outlining the program which had been adopted for the future and explaining the economic potential of uranium mining. Mr. Gurley's report stated, in part:

"For the past four or five weeks these preliminary investigations have been carried on. The reports which were made currently suggested the pos-

sibility of a worthwhile deposit. We retained the services of consulting mining geologists, and on Monday, December 11, at a conference on the ground in New Mexico, which I attended, it was arranged to have a thorough exploration made by a combination of (1) drilling, and (2) trench pits on a 90-acre area where previous examinations and the general lay of the land suggested such a thorough exploration. Work on this exploration has started, and with good weather it should be completed within about three months. The elevation is approximately 7000 feet, and we might reasonably anticipate some delay due to snow during the next two or three months.

"The indications given on geiger counters and scintillometers suggest the possibilities of uranium minerals on some other sections of Santa Fe Pacific land, but plans about exploration in other areas await the result of the 90-acre exploration. The reactions of geiger counters and scintillometers are indications only and are not conclusive. The only way in which one can determine conclusively whether there is a deposit of uranium minerals in commercial quantities is by the process described in the preceding paragraph.

\*　\*　\*　\*　\*　\*

"In brief summary, we have knowledge of uranium bearing ores which warrant thorough investigation to determine whether the deposits are of mineable proportion, or merely interesting phenomena. \* \* \*"

10. On December 15, 1950, taxpayer entered into a contract with F. D. Shufflebarger to do test drilling, excavate pits, and perform other work in connection with the program.

11. The initial work was undertaken on Section 19 (Haystack). As a horizontal control for the work and to permit accurate mapping of the surface and sub-surface, a grid system lined to approximately the cardinal directions was established and staked out on the ground. In setting out this grid system, wooden stakes were placed at 100 foot intervals and identified as to location by a letter of the alphabet indicating its position on a north-south coordinate line, and a number indicating its position on a west-east coordinate line. This grid system was later used on all sections by taxpayer.

12. In the work on Section 19 (Haystack) scintillometer readings indicating gamma ray counts-per-second were taken at 50 foot intervals at the surface of the ground over the entire 97 acres. From this information an Isorad map was completed, prior to January 3, 1951, showing lines of equal radioactive intensity. It was hoped that a correlation could be established between the intensity of radioactivity and the approximate grade and extent of underlying ore. This correlation was not established because of the shielding effect of the overburden and the existence of radon gas. Therefore, the taxpayer found it necessary to undertake a program of sampling to obtain more accurate information as to the location, grade and extent of uranium deposits.

13. Three methods were used on Section 19 (Haystack). One method was applied to the investigation of the mineralized outcroppings of the mesa. To determine the effect of weathering on the Todilto limestone outcroppings, a line of drill holes placed 5 to 10 feet apart and 4 to 5 feet back from the rim were charged with dynamite and the face of the outcroppings blown off to expose the unaltered limestone. The results of this operation were somewhat inconclusive because of the extension of the weathered limestone back to and beyond the line of holes. It was established, however, that the mineralization of the rimrock was not continuous. This fact was later verified by the assay grade of drill hole and bulk samples taken near the rim.

The second method consisted of drilling holes $2\frac{1}{2}$ inches in diameter into the Todilto limestone and collecting the drill cuttings in a metal container surmounted by a canvas bag at the collar of the hole. After the overburden had been bulldozed from each corner location of

the surface rim, a drill hole was put down (at each 100 foot interval) until the drill cuttings indicated that the sandstone underlying the limestone had been reached. In Section 19 (Haystack) the thickness of the Todilto limestone seldom exceeded 18 feet, which depth was easily attained by jack-hammer drills. Samples were taken from the limestone at 2 foot vertical intervals until the underlying sandstone was reached.

The third method consisted of the removal of bulk quantities of limestone rock from pits located at the center of each 100 foot grid square. These samples, blasted from pits of 5 x 5 feet, were taken at 2 foot intervals. At the conclusion of each day's field operation, the collected samples were brought to the field laboratory, pulverized and placed in envelopes and labelled with the grid system letters and numbers to show its origin. The envelopes were then forwarded to the assay laboratory.

14. The data gathered on Section 19 was kept current by daily postings on records and maps. By the establishment of the grid system each point on the 97 acres of Section 19 (Haystack) could be identified. Each hole or pit was assigned a letter and number showing its position relative to the grid system and information was entered on a 4″ x 6″ file card for that point. The information entered included the elevation at top of ground, elevation of bedrock, scintillometer readings, and the results of assays. However, because of the delay in receiving laboratory equipment, a delay was experienced in assaying the samples taken from the drill holes and center pits. In a report to Mr. Gurley dated January 26, 1951, concerning progress, Mr. Evans stated that although 709 samples from 161 drill holes and center pits had been delivered to the laboratory, the assays had been completed on only 257 samples from 95 drill holes and center pits. Mr. Evans wrote that "Inasmuch as the samples are coming in about 2½ times as fast as we can assay them, we are planning to put on two shifts in our assay laboratory and also in the crushing and pulverizing department. With the receipt of another assaying instrument, expected on January 27th, we shall be able to catch up on our sampling program."

15. On December 28, 1950, approximately five tons of uranium ore (tyuyamunite in limestone) were shipped from Section 19 (Haystack) to the mill of American Smelting and Refining Company in Monticello, Utah. On or about January 17, 1951, settlement sheets were mailed to the taxpayer entitling it to payment of $112.40 for this ore. Assay returns on such ore from American Smelting and Refining Company showed 0.39% $U_3O_8$ (uranium oxide) and 0.30% $V_2O_5$ (vanadium oxide). Aside from the assaying of the sample, the purpose of the shipments was to attempt to determine a method by which the uranium oxide could be recovered from the ore. The processing mills then in operation obtaining uranium from secondary uranium minerals were equipped to handle carnotite, a secondary uranium mineral in the host rock, sandstone. The recovery method employed for the sandstone could not be used where, as here, the host rock was limestone.

16. Amenability tests performed on the ore from Section 19 (Haystack) by the United States Bureau of Mines showed that 92.5% of the uranium oxide contained in the ore could be extracted by means of an alkaline leach process. The recovery of the uranium from the limestone on any but an experimental basis required the construction of a processing mill designed for that purpose. Just when the final decision on such a mill was made is not clear. However, the decision apparently had not been made as of March 27, 1951. In a report to Mr. Gurley on that date, Mr. Evans stated, in part:

"Representatives of the Bureau of Public Roads, accompanied by Atomic Energy Commission men, called at this office March 23d. They believed that a program of road improvement and building should be inaugurated to facilitate movement of ore to the mill site. In our opinion this action on the part

of the authorities seems premature inasmuch as we are unaware of any decision to erect a mill, nor of its location if erected."

17. The activity on the other sections, while carried on at different times after the beginning of the exploration of Section 19 (Haystack), followed the same exploration program and employed the same or comparable techniques. The other sections, all in McKinley County, New Mexico, were:

(1) Section 13, T. 13 N., R. 11 W.

(2) Section 19, T. 13 N., R. 9 W. (Poison Canyon)

(3) Section 23, T. 13 N., R. 10 W.

(4) Section 25, T. 13 N., R. 10 W.

(5) Section 31, T. 13 N., R. 9 W.

18. Uranium mineralization was first found on Section 19 (Poison Canyon) on January 20, 1951, and work was begun there on July 9, 1951. It was a small outcropping of carnotite in the Westwater sandstone of the Morrison formation. The mineralization on Section 19 (Poison Canyon) differed from those on other Santa Fe properties in that the host rock was sandstone rather than limestone. Also, tunneling was attempted initially but the condition of the sandstone was such that the cost and labor involved in shoring up the tunnels was prohibitive. Consequently, this plan was abandoned in favor of trenching. In the course of the tunneling and trenching operations, some ore was found and stockpiled. However, such activity did not constitute development (or, much less, production) since that which was found and stockpiled was merely that which was removed from the trench or tunnel during excavation. The primary purpose of the tunneling and trenching was to search for and locate ore. In his report of July 27, 1951, addressed to Mr. Gurley, Mr. Evans stated, in part:

"*Section 19, Township 13 North, Range 9 West*

"Exploration work on this section was begun July 9, and the work consists of excavating a trench across a finger of the Morrison formation to develop information concerning the ore deposition. In order that you may recall the location of this work, it is being done at the point you visited on the small hill in Poison Canyon."

19. "Exploration" is generally defined by all authorities as the search for or investigation of a mineral deposit. The techniques employed in exploration, such as core drilling, bulk sampling by means of pits and assaying the samples obtained have as their immediate object the determination of the existence, location, extent and/or quality of a mineral deposit.

20. "Development" as generally defined by the authorities is the preparation of the explored deposit for extraction and exploitation. The techniques employed, such as stripping, shafting or tunneling, have, as their immediate object, the opening up of the deposit or the gaining of access to the deposit so that the actual mining of the deposit may take place.

21. On all sections involved, the program of exploration proposed by Mr. Evans and authorized by Mr. Gurley at the meeting of December 11, 1951, was carried out with but minor variation or alteration. The taxpayer set out to make a thorough exploration of the properties and that is precisely what was done.

22. Aside from the fact that the exploration schedule as initially proposed and authorized was followed throughout, other facts also establish that development did not ensue during the period in dispute.

The uranium deposits were not in continuous veins or solid beds but were in isolated, disconnected pockets of varying grade. These pockets could be located only by means of the core drilling and center pitting.

Because of the relatively shallow overburden, strip mining was contemplated. Thus, it was necessary not only to find where the deposits were but also to determine where they were not so that the overburden would not be pushed to an area which might later be discovered to be of high mineralization.

All sales of ore were governed by the Atomic Energy Commission and payment

was pursuant to a schedule which provided for different prices for different grades as well as penalties or bonuses depending upon the grade. Thus, the blending of deposits of different grades became desirable so as to achieve the highest return on the overall operation.

The operation involved the first investigation of any size of a uranium occurrence in limestone. Little was known of the characteristics of such occurrences. Consequently, a conservative procedure of exploration was most prudent and would offer, ultimately, the best chance for the recovery of optimum profit from the operation.

Until a method of extracting the uranium oxide from the limestone was devised it was not known whether the deposit would be susceptible of profitable exploitation.

Even after the extraction process was devised, until such time as a mill was constructed, there was no commercial market for the ore. However certain it may have been that the facilities for the purchase of the ore would be established, it is a fact that until such facilities were established there was no market.

23. These facts establish that not only was the initial exploration program followed but that common sense and sound business practice would dictate that no other course was practicable.

24. Even though on some sections bodies of ore or potential ore had been located, the taxpayer made no effort to "develop" these bodies, that is, to open up the deposits to make them accessible and susceptible to extraction. To have done so would have jeopardized the profit potential of the overall operation because not enough was known about the mineralization on the balance of the particular section.

25. Also, at the time these ore bodies were located there were no facilities for the purchase of such materials except on a sample basis for study and experimental purposes. Consequently, the ore deposits cannot be regarded as having been "commercially marketable" as required by the statute. And, as stated, in any event, the taxpayer took no steps to employ the techniques of development. Rather, it continued exploration to gain further information about the size, shape, and quality of the ore bodies and to locate other possible ore bodies.

26. The taxpayer maintains that after the following "cut-off" dates, all expenditures on a given property were "development" expenses rather than "exploration" expenses:

| Section | Cut-Off-Date |
| --- | --- |
| Section 13 | May 15, 1951 |
| Section 19 (Haystack) | January 24, 1951 |
| Section 19 (Poison Canyon) | August 31, 1951 |
| Section 23 | June 30, 1951 |
| Section 25 | February 21, 1951 |
| Section 31 | August 31, 1951 |

The taxpayer's assistant engineer, James E. Inman, testified that in December of 1951, at the request of the taxpayer's auditor, he went back over the records of the operations and from those records established the above dates. This was clearly a hindsight determination. Mr. Inman was able to rely on, not only the overall technical knowledge of the characteristics of tyuyamunite not available at the time, but also of assay reports not available at those times. Although the drill holes and some center pits may have existed as of those dates, the assays of the samples taken would not have been completed. Also, the center pitting and bulk sampling had not been completed. Although this process was

later discontinued, in January of 1951, the bulk samples were deemed necessary as a check on the core drill samples.

27. This hindsight determination indicates that at those purported "cut-off" dates the men on the sites were unaware of having supposedly passed from the exploration to the development of a property. Rather, they continued with their established plan of exploration.

■ 28. The evidence presented at the trial falls far short of sustaining plaintiff-taxpayer's required burden of proof that any of the expenditures in dispute here were paid or incurred "for the development of a mine or other natural deposit" or that any of the expenditures in dispute here were paid or incurred "after the existence of ores in commercially marketable quantities had been disclosed."

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the controversy.

2. Any finding of fact which might be deemed a conclusion of law is hereby concluded as a matter of law.

3. The plaintiff-taxpayer has failed to carry its burden of proof of the elements of its case.

4. The law is with the Government and against the plaintiff-taxpayer on the issues in dispute.

■ 5. The applicable provisions of the Internal Revenue Code of 1939, namely, subsections 23(cc) and 23(ff), require, for purposes of the case at bar, that two conditions be met before a given expenditure may be deducted as a development expense: (1) The expenditure must have been paid or incurred "after the existence of ores or minerals in commercially marketable quantities has been disclosed," and (2) the expenditure must have been paid or incurred "for the development of a mine or other natural deposit." Plaintiff-taxpayer has failed to show that any of the expenditures which it incurred after the so-called "cut-off" dates alleged were paid or incurred after either one of these two conditions had been met.

6. The taxpayer wholly failed to establish any subsequent dates as "cut-off" dates, and therefore all of the expenditures in dispute must be regarded as exploration costs. The expenditures in dispute must, therefore, be treated as exploration costs and not as development costs for federal income tax purposes.

7. Each of the fractional sections involved in this cause did not constitute a single and separate "mine or other natural deposit" within the meaning of Section 23(cc) of the Internal Revenue Code of 1939.

8. Plaintiff has filed all necessary claims for refund of income taxes for the calendar years 1951-1953, inclusive, in the manner and within the time required by law and has brought this suit based on those claims within and in conformance with the time limits required by law.

9. A judgment order should be entered herein in favor of defendant Government following a computation to be made by defendant Government of the amount of the judgment, in conformity with the decision of this court, and after submission of such computation to the plaintiff for inspection as to accuracy.