ESTATE OF ALEXIA DUPONT ORTIZ DEBIE, DECEASED, E. RUSSELL JONES, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1912–68. Filed July 29, 1971.

*Howard L. Williams,* for the petitioner.
*David R. Brennan,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax against the petitioner as follows:

| Year | Deficiency |
| --- | --- |
| 1960 | $25,345.83 |
| 1961 | 68,137.73 |
| 1962 | 73,729.91 |
| Total | 167,213.47 |

Certain issues having been conceded, the only issues remaining for determination are (1) whether certain amounts spent by the petitioner in connection with a mine constitute deductible development expenses as claimed by petitioner or nondeductible exploration expenses as determined by the respondent, and (2) the value of certain tangible personal property donated by the petitioner in 1961 and 1962 to a charitable organization. Certain other adjustments are in issue solely because they depend on the proper amount of adjusted gross income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Alexia DuPont Ortiz DeBie filed her individual Federal income tax returns for the taxable years 1960, 1961, and 1962 with the district

director of internal revenue, Wilmington, Del. She died on February 11, 1963, and E. Russell Jones was appointed executor of her estate. At the time of the filing of the petition herein, the executor of the estate resided in Wilmington, Del. As a matter of convenience, the deceased, Alexia DeBie, shall be referred to as the petitioner rather than the estate.

In 1953, petitioner acquired a leasehold interest in property known as the "Deer Trail Mine." During the period 1954 through 1962, she operated the Deer Trail Mine as a lessee doing business under the name of Arundel Mining Co.

The mine is located about 5 miles southwest of Marysvale, Utah, which is about 190 miles south of Salt Lake City, Utah. The mine lies on the east side of a range of mountains known as the Tushar Mountains. The mine is in the foothills of the mountains, at a low elevation in relation to the height of the surrounding mountains.

Faulting has been important in the geological history and creation of the Tushar Mountains. There is considerable north-south faulting parallel to the great faults that outline the range. A fault is a fracture in the earth's surface along which there has been movement of the rock.

When petitioner acquired the mine, the main area of work was an area in the AID tunnel 3,400 feet from the portal of the tunnel. The AID tunnel was a haulage tunnel driven horizontally into the side of the mountain. The portal was at an elevation of approximately 6,900 feet above sea level. The AID tunnel proceeded in a westerly direction about 1,300 feet from the portal and then turned to a north-westerly direction and continued to a point about 5,000 feet from the portal. Five hundred feet vertically above the AID tunnel was the tunnel of the old Deer Trail Mine. This tunnel had a length of several thousand feet. The main workings in the old Deer Trail Mine were 500 feet vertically above and just beyond the 3,400 area of the AID tunnel. Over its history, the old Deer Trail Mine had produced about 190,000 tons of ore, principally gold and silver, with a value in excess of $3 million until it ceased producing during World War II when restrictions prohibited the mining of gold. Vertically above the old Deer Trail tunnel was the Lucky Boy tunnel, which involved ore beds considerably higher in elevation than the old Deer Trail ore bed.

Before she acquired the mine, petitioner, in 1953, requested Quillen Treseder, a geologist and mining engineer employed by Anaconda Co., to examine and analyze the mine and recommend whether money should be spent in further working the 3,400 area of the AID tunnel. On two prior occasions in 1942 and 1952, Treseder had made analyses of the mine for Anaconda. When he examined the mine in 1942, the AID tunnel had been driven only 1,300 feet and most of the old Deer Trail tunnel was still accessible. Prior to Treseder's examination in

1953, there had been some extraction of ore from the 3,400 area. Based on this and on the known occurrences of ore, he recommended further work in the area. At this time he again examined and considered the old Deer Trail Mine. He was familiar with the ore that had been extracted from it and the approximate locations from which it had been extracted, but had no specific plans to further work the old Deer Trail ore body.

In March 1954, petitioner hired Treseder to operate the mine. Since that time, he has worked continuously as the mine's sole geologist and engineer. His responsibilities have included recommending to petitioner policies and programs for the mine and subject to petitioner's approval, carrying these out. During this period until 1963, there had also been from 10 to 15 other people employed in the total operations of the mine.

When Treseder started working at the mine, operations had been underway for a number of months. However, these operations were antiquated and inefficient. For the next 6 to 8 months, work in the mine was concentrated on rehabilitating and mechanizing the mine's operations to the greatest possible extent.

During the period from 1954 through 1959, the work in the AID tunnel was almost entirely related to the ore (principally lead, zinc, and copper) that had been exposed in the 3,400 area. The 3,400 area contained a mineral deposit of sufficient size, quality, and grade to reasonably justify exploitation with the possibility of profit after the cost of extraction and processing.

Since he began operating the mine in 1954, Treseder, as a geologist, has taken account of a number of considerations in determining which way to go and what to do to locate ore. He has tried to determine what localized the ore in a particular area and the effect of various factors that were exposed in the course of the workings on the presence and location of larger ore occurrences. Some of the factors involved are the presence of veins, fissures, or faulting action, the existence of beds that are receptive to the localization of ore, and the occurrence of silicification or rock alteration. Based upon these various factors Treseder would formulate a projection as to where the ore might be encountered.

From the prior workings in the 3,400 area, Treseder had a general idea of the stratification, fracturing, and fissuring in that area. In the 3,400 area there was a bed of limestone, the Kaibab. Under this was a bed of quartzite, the Coconino, about 450 feet thick. Under the Coconino was another limestone bed, the Hermosa. Limestone beds are generally considered to be host rocks favorable to the deposition of ore.

Prior to 1954, some ore had been mined from the tunnel level in the 3,400 but no substantial deposits had been disclosed. When Treseder began the workings in the 3,400 area after 1954, varying amounts and varying grades of ore were exposed. This ore occurred in an area of silicification. An area of silicification results from the conversion of a part of a limestone bed into silica. This conversion preceded the deposition of the ore so that ore occurrences in the 3,400 area were associated with the area of silicification. The tunnel level of the 3,400 area was the top of a silicified area. Treseder projected that there were favorable ore beds in the Hermosa below the tunnel level along the silicified contact, and sank a shaft down from the tunnel level to a level 100 feet vertically below the tunnel level. Workings were extended on the 100 level. Some of the ore that was exposed was an excellent grade of ore and some was only a modest grade. Shortly after operations began, a vein of high-grade ore a few feet thick was exposed below the tunnel level. This was followed downward and enlarged into a vein of ore about 10 to 15 feet thick. During this period, prior to the years in question, ore, some of which was very high grade, was extracted from the 100 level.

From the 100 level, Treseder projected both the silicified area and the ore down to a level 200 feet vertically below the tunnel level. Prior to the years in question a shaft was sunk down from the 100 level to the 200 level and workings were extended at the 200 level.

During 1960, a total of $75,577.69 was spent on the various workings in the 3,400 area of the AID tunnel. An amount of $5,668.19 was spent in driving 201 East Drift (a drift is a horizontal working driven parallel to a vein or bed). The principal reason for driving 201 East Drift was because both good mining practices and the State mining code require for safety purposes that there be at least two openings connecting different levels in the mine. At the time the only entry to the 200 level was the shaft from the 100 level. On the 100 level above this, a drift had been driven and a raise (which is a working driven upward for access) run up to the tunnel level, thereby providing an escapeway from the 100 level. 201 East Drift was driven in order to come up under this so that a raise could be connected with the escapeway at the 100 level and thereby provide an escapeway from the 200 level to the tunnel through the 100 level. Treseder made it a policy that whenever he was required to drive a drift such as the 201 East Drift he would drive it along a fissure or mineralized contact that might lead to the development of ore.

While 201 East Drift was being driven, in another area of the 200 level, a raise was being driven in connection with mining some ore. Eventually this raise was extended upward to connect with a sub-

level of the 100 level. Since this then provided a second escapeway from the 200 level, there was no further need to continue 201 East Drift and it was stopped.

An amount of $3,949.37 was spent in 1960 on 206 West Drift. At 206 Raise #2 there was a fairly large area of ore, which as it continued started to thin out. The ore occured in an area of silicification. Treseder drove 206 West Drift along the silicified contact to see whether the ore would increase in quantity. After it was driven a short distance, it appeared that the ore did not extend out along the area of silicification and the drift was stopped.

An amount of $3,728.31 was spent in 1960 on 208 Drift. In the 207 Drift there was an ore vein which Treseder had been following until it split into two directions. Generally, it is good mining practice when such a split occurs either to follow the vein or to crosscut to where it is expected to go. This was an area of heavy ground and since such tends to break up timbers, it was not prudent to attempt to follow the vein. Treseder projected where the vein might be encountered again and drove 208 Drift to intersect his projection of the ore. The vein was not encountered as projected and after driving 208 Drift a little beyond the projected point, Treseder stopped the drift since the vein was still not seen.

During 1960, the remaining amount of $62,231.82 was spent on various other workings in the 3,400 area and is not in question since the respondent allowed such amount as development expenditures.

During 1961, a total of $28,993.44 was spent on the workings in the 3,400 area. An amount of $975.32 was spent on the 210 Crosscut (a crosscut is a horizontal working driven across the face of a vein or bed) to follow an ore occurrence which had been encountered in the northwest area of the 200 level. It was only driven a short distance and then stopped. An amount of $2,654.59 was spent on 211 Drift, which was practically adjacent to 210 Crosscut and was driven for reasons similar to 210 Crosscut and was also stopped. These workings were not continued to the extent intended by Treseder because it developed that there was no longer a market for the type of ore in the 3,400 area. The remaining amount of $25,363.53 was spent in 1961 on other workings in the 3,400 area and is not in question, having been allowed by respondent as development expenditures.

During 1962, a total of $12,276.58 was spent on the workings in the 3,400 area. The only work done consisted of winding up the mine's operations in that area. Such amount is not in question since respondent has allowed it as development expenditures.

When it became apparent that there was no further point in working the 3,400 area, Treseder started operations to extend the AID tunnel toward the downward extension of the old Deer Trail ore body.

The ore in the old Deer Trail Mine was in the Kaibab limestone bed occurring at its base where it came into contact with the Coconino quartzite bed. The beds in this area had been formed into an anticline which is an upward bulging of the strata. The ore in the old Deer Trail Mine occurred at the top of the anticline and followed it as it gradually declined in a northwest direction. In the old Deer Trail Mine the anticline was the localizer of the old Deer Trail ore body. The length of the old Deer Trail ore body was over several thousand feet. At its most easterly point, the ore body was about 150 feet above the level of the old Deer Trail tunnel. It gradually declined in a northwest direction until it intersected the tunnel and continued on below the tunnel level. During the operations of the old Deer Trail Mine, ore had been extracted below the tunnel level. Wenzes (which are workings driven downward from one point to another) had been driven below the tunnel level at an incline approximately following the ore body. At the bottom of the wenzes, about 100 feet vertically below the tunnel level, a subdrift was driven. Mineralization was encountered along these workings.

During 1955 and 1956, while operations in the mine were concentrated in the 3,400 area of the AID tunnel, Treseder did some work to open up the old Deer Trail Mine and go back to the area where the ore body went below the tunnel level. In doing so, he was principally concerned with examining the strength of the old ore body as it plunged downward. He did not go beyond the existing workings of the old mine. Treseder also went into the Lucky Boy tunnel above the old Deer Trail tunnel in order to examine the fissuring present there.

Treseder projected a downward extension of the old Deer Trail ore body to the level of the AID tunnel. Beginning in 1960, the AID tunnel was driven forward from the 5,000 area to intersect the downward extension of the old Deer Trail ore body. Treseder wanted the AID tunnel to be near the ore body, but not to intersect it. Since the AID tunnel was a haulage tunnel, it was driven in as straight a line as possible and continued to go in a northwest direction. The line was not varied until the contact between the Kaibab limestone bed and the Coconino quartzite bed was encountered. Once the contact was reached it could be followed to lead to the ore body.

During 1960, the AID tunnel was driven forward to an area 8,200 feet from the portal of the tunnel. In the 8,200 area, 17 North Drift was driven off the AID tunnel in a northerly direction. In the latter part of 1960, in the 17 Stope area (which is an area from which ore is extracted), a part of the 17 North Drift, ore was encountered. The mineral deposit in the 17 Stope area was of sufficient size, quality, and grade to reasonably justify exploitation with the possibility of profit

after the cost of extraction and processing. Subsequent efforts in the 8,200 area of the mine were directed at developing its size and location and the workings necessary for extracting it. The ore in the 17 Stope area was part of the downward extension of the old Deer Trail ore body. It occurred on the left flange of the anticline.

In the 8,200 area there was a considerable amount of quartzite. In attempting to follow favorable indications to locate ore, it is generally possible either to drill core holes using diamond drill bits or to drive a working to follow the contact. In quartzite in the 3,400 area, which was similar to that in the 8,200 area, it had proved very difficult for the diamond drill bits to penetrate. In trying to locate ore in the 8,200 area, Treseder decided, because of the prior experience, generally to drive workings instead of drilling.

In 1960 and 1961, the amounts of $17,199.02 and $10,727.13 were spent in driving 19 Drift. The 19 Drift started off the AID tunnel at a point where Treseder observed that in the quartzite under the ore there were numerous quartz stringers and veinlets which are characteristic in quartzite under or adjacent to an ore body. Treseder concluded that these quartz stringers underlay a portion of the ore body. The 19 Drift was driven along this contact to see whether the ore could be located. No ore was exposed during the driving of the 19 Drift and the work was stopped.

During 1961, an amount of $8,114.81 was spent on 19 #1 Crosscut West which was driven off the 19 Drift to the west. An ore body does not always stay at the top of a quartzite bed, but often migrates to beds higher in elevation. At the point where the 19 #1 Crosscut West was driven there was a considerable amount of rock alteration of the type that in the mine was related to ore occurrences. Treseder drove the crosscut to follow the rock alteration to see whether it indicated if the ore body had migrated to a higher bed. The ore body was not encountered and the working was stopped.

During 1961 and 1962, the amounts of $36,579.44 and $29,375.42, respectively, were spent in extending 17 North Drift. Treseder had projected that the main occurrence of the old Deer Trail ore body extended along the anticline, and the purpose of extending 17 North Drift was to follow the projection. When the work on the 17 North Drift ended in 1962, the ore body had not been encountered as projected. Subsequent work was done on extending it further to the east and based on all the favorable indications present, Treseder still projects that this is the main area of occurrence of the downward extension of the old Deer Trail ore body.

During 1962, the amounts of $522.99, $2,452.40, and $13,141.60 were spent on 17–B Crosscut, 17–C Crosscut, and 17–D Crosscut, respectively, all of which were driven off the northern part of the extension of 17 North Drift. The 17–B Crosscut was driven a short distance

off the drift to the west at a point where there was an occurrence of iron sulfide. Treseder followed the occurrence to see if it led to the ore body at the point where the quartzite bed came into contact with the limestone bed. When 17–B Crosscut reached the point of contact, Treseder stopped it because there was no ore present. When 17–C Crosscut was originally driven, Treseder intended it to be a storage area for mine cars and other equipment. Since a mine is an enclosed space, it is often necessary to drive extra workings to provide additional space for storage. When Treseder decided to continue the extension of the 17 North Drift, it was as a continuation of the 17–C Crosscut which then became a part of the extension of the 17 North Drift. Treseder drove 17–D Crosscut to follow an occurrence of iron sulfide to see if it led to ore. No ore was encountered and the working was stopped.

During 1962, an amount of $6,285.11 was spent on driving 26 Crosscut. The 26 Crosscut was driven from the extension of 17 North Drift. On the surface about a thousand feet above this point a quartz vein which had some favorable showings of ore had been exposed. As part of the lease for the mine which had been negotiated during 1962, petitioner was required to extend workings to intersect a downward projection of this quartz vein. Treseder drove 26 Crosscut to a point where he was satisfied that the quartz vein had been intersected and when no ore body was encountered, he stopped it. Treseder considered this working to be exploratory since it was not a part of his projection of the old Deer Trail ore body. This amount is not now in issue since the petitioner conceded at the trial that it constituted a nondeductible exploration expenditure.

During 1960, 1961, and 1962, additional amounts of $43,376.60, $63,988.91, and $91,064.23, respectively, were spent on various other workings in the 8,200 area of the AID tunnel. Such amounts are not in question since the respondent allowed such amounts as development expenditures.

During 1962, the amounts of $2,317.52, $574.09, $759.98, and $710.78 were spent on Diamond Drill Station #2 and Diamond Drill Holes 20–3, 20–4, and 20–5, respectively. During 1962, Treseder wanted to sink a shaft to the west of the 17 Stope area in preparation for extracting ore from that area. In order to determine a location for the shaft that would not jeopardize the ore body Treseder decided to drill core holes using diamond drill bits to find a safe location. Since the drill rods being used varied in length up to 20 feet, it was necessary to have sufficient room behind them so that they could be placed into and withdrawn from the rock. An area where Treseder intended to drill the holes was enlarged into Diamond Drill Station #2.

Diamond Drill Holes 20–3 and 20–4 were drilled and showed

that the ore body was not tending in their directions and that the shaft could be safely located where Treseder wanted it. After this had been established, Diamond Drill Hole 20–5 was drilled in the direction of the ore in the 17 Stope area at a shallow depth in order to determine the direction and downward trend of the ore body. The hole encountered no ore, missing the ore body by 11 feet.

Prior to petitioner's death in 1963, the basic objective of the mine's operations was not the production of ore. The efforts in the mine in the period ending with 1962 were directed at determining the size and location of the ore bodies present in the 3,400 and 8,200 areas and the workings necessary for extracting the ore. It is not good mining practice to start to extract ore immediately after it has been exposed because it can result in congestion in the mine and higher costs thereafter when an ore body is further developed. Rather, it is preferable to determine initially the size, character, and nature of the ore body. There are numerous methods for extracting ore which varied in cost depending on the shape, size, and dimension of the ore body and the character of the rock enclosing it. It was necessary for Treseder to know these factors so that he could select the best method for extracting ore in preparation for the production stage of the mine's operations.

At times in driving various workings in the mine, it was necessary to go through lower grade ore. During the period 1954 through 1962, in terms of costs of labor, materials, machinery, and so forth and the cost of shipping, the extraction of ore was not profitable unless the ore was worth at least $21 per ton. The cost of shipping ore to the smelter was $12 per ton. Thus, lower grade ore extracted while extending the workings which was worth $15 per ton would be shipped to the smelter. This was done since the ore had to be removed from the mine in any event and although not profitable, it would produce a $3 return after deducting shipping costs.

During the period 1954 through 1962, the production and proceeds from ore sold were as follows:

| Year | Tonnage | Proceeds less assaying, haulage, royalty, freight and treatment costs |
|------|---------|-----------------------------------------------------------------------|
| 1954 | 74. 305 | $4, 235. 58 |
| 1955 | 396. 894 | 8, 901. 17 |
| 1956 | 0 | 0 |
| 1957 | 539. 0485 | 7, 498. 16 |
| 1958 | 460. 935 | 5, 004. 83 |
| 1959 | 0 | 0 |
| 1960 | 214. 5435 | 1, 940. 96 |
| 1961 | 749. 7085 | 26, 764. 81 |
| 1962 | 1, 313. 674 | 10, 904. 00 |
| Total | 3, 749. 1085 | 65, 249. 51 |

Most of the ore extracted was lead, zinc, and copper, with smaller amounts of gold and silver.

After petitioner's death in 1963 and during 1964 until a corporation took over operations of the mine, there were no sales of ore from the mine. On August 16, 1964, a corporation took over operations of the mine and it was necessary for the mine to become self-sustaining from the receipts for ore produced and sold. After this date, the production of ore from the mine and the profit or loss were as follows:

| Year | Tonnage | Gross payments for metals | Net profit (or loss) before depletion and income taxes |
|------|---------|---------------------------|--------------------------------------------------------|
| 8/16/64 to end of 1964 | 6,986.414 | $172,920.79 | $54,152.66 |
| 1965 | 9,065.569 | 273,986.40 | 45,413.25 |
| 1966 | 10,428.374 | 334,201.71 | 59,454.48 |
| 1967 | 4,192.649 | 109,903.18 | (19,564.20) |
| 1968 | 4,835.420 | 303,127.95 | 68,924.48 |
| 1969 thru 8/31/69 | 7,530.501 | 460,552.01 | 171,370.17 |
| Total | 43,038.927 | 1,654,692.04 | 379,750.84 |

Most of the production of ore has come from the 17 Stope area.

On her individual Federal income tax return for the taxable year 1960, petitioner reported total expenditures for the mine of $154,772.69 and receipts from ore sales of $2,318.71. The difference of $152,453.98 was claimed as a deduction for development expenses under section 616 of the Internal Revenue Code. On her return for 1961, petitioner reported total expenditures for the mine of $170,177.35 and net receipts from ore sales of $26,147.20. The difference of $144,030.15 was claimed as a deduction for development expenses. On her return for 1962, petitioner reported total expenditures for the mine of $194,057.14 and net receipts from ore sales of $9,519.56. The difference of $184,537.58 was deducted as a development expense.

In the notice of deficiency, the respondent determined that the allowable deductions for development expenses under section 616 of the Internal Revenue Code were $122,982.08, $84,994.64, and $125,400.49 for the taxable years 1960, 1961, and 1962, respectively. He also stated that the disallowed amounts of $29,471.90, $59,035.51, and $59,137.09 for 1960, 1961, and 1962, respectively, represented exploration expenses and were not deductible because of the limitation of section 615(c)(1) of the Internal Revenue Code.

The expenditures treated by respondent as exploration expenses are as follows:

*1960*

3,400 area:

| | |
|---|---|
| 201 East Drift | $5, 668. 19 |
| 206 West Drift | 3, 949. 37 |
| 208 Drift | 3, 728. 31 |

8,200 area:

| | |
|---|---|
| 19 Drift | 17, 199. 02 |
| Total | 30, 544. 89 |
| Less: Inventory adjustment | (1, 072. 99) |
| | 29, 471. 90 |

*1961*

3,400 area:

| | |
|---|---|
| 210 Crosscut | $975. 32 |
| 211 Drift | 2, 654. 59 |

8,200 area:

| | |
|---|---|
| 17 North Drift | 36, 579. 44 |
| 19 Drift | 10, 727. 13 |
| 19 West Crosscut | 8, 114. 81 |
| Total | 59, 051. 29 |
| Less: Inventory adjustment | (15. 78) |
| | 59, 035. 51 |

*1962*

8,200 area:

| | |
|---|---|
| 17 North Drift | $29, 375. 42 |
| 17-B Crosscut | 522. 99 |
| 17-C Crosscut | 2, 452. 40 |
| 17-D Crosscut | 13, 141. 60 |
| 26 Crosscut | 6, 285. 11 |

Other:

| | |
|---|---|
| Diamond Drill Station #2 | 805. 55 |
| Diamond Drill Hole 20–5 | 710. 78 |
| Total | 53, 293. 85 |
| Plus: Inventory adjustment | 5, 843. 24 |
| | 59, 137. 09 |

Prior to December 27, 1957, petitioner owned certain property located in Greenville, Del., which she had inherited from her mother, which included a tract known as "Valmy," comprised of 75.8 acres and a 30-room house.

On December 27, 1957, the Vallex Trust was formed as a charitable trust. During 1957, petitioner donated to such trust the house on the Valmy property and the abutting 7⅓ acres, but not the contents of the house. On November 22, 1957, the Psychosyntheses Research Foundation (hereinafter referred to as P.R.F.) was formed as a nonprofit corporation under Delaware law. On March 30, 1959, P.R.F. qualified as a tax-exempt organization under the provisions of the Internal Revenue Code of 1954. On April 20, 1960, the Vallex Trust conveyed all of its assets, including its Valmy property, to P.R.F.

In 1961, petitioner asked her financial adviser, E. Russell Jones, to contact William J. Simpson of Wilmington, Del., to make an appraisal of the tangible personal property contained in the Valmy house. Simpson had been in the antique business, buying and selling, appraising, estimating, repairing, and refinishing antiques, since 1914. His specialty is antique furniture, particularly American furniture, and he has been doing his own appraisals since 1930. He was familiar with much of the property in the house because of work he had done on prior occasions in repairing it for petitioner.

Simpson visited the house with Jones on a number of occasions and went through the contents of each room separately. He found that there was much property, such as china, plateware, glassware, and French objects of art, which were beyond his specialty. Before proceeding with the appraisal, he called on Paul Arons of Ansonia, Conn., to assist him in valuing these objects. Arons had been in the business of buying and selling and appraising antiques since 1946.

Arons and Simpson spent 2 days going through the contents of the house. They examined and considered each piece of property individually and reached an agreement as to the value of each. The total of the amounts for the items in the rooms on the first floor of the house was $36,163 and the total for the rooms on the upper floors was $22,245. In making this appraisal neither Simpson nor Arons knew the purpose for which petitioner was requesting the valuation of the tangible personal property in the house.

Thereafter, in 1961 petitioner donated the tangible personal property contained in the upper floors of the house to P.R.F. During 1962, she donated the contents of the main floor to P.R.F. After receiving all this property P.R.F. gave some of the furniture present in the servants' quarters to the caretakers of the house.

P.R.F. used the house and the abutting 7⅓ acres as its headquarters. The house was also used upon occasion as the site for weekend conferences held in connection with its activities. Prior to petitioner's death in February 1963, P.R.F.'s only source of income was contributions from a number of people, including petitioner. During this period, its expenditures generally equaled its income.

After petitioner's death, P.R.F. received an additional 45 acres of land under the terms of her will. Even with the anticipated proceeds of the sale of this property, the management of P.R.F. concluded that it would no longer have sufficient income to remain at its then location and to continue to carry on its activities since it had lost one of its main contributors, the petitioner. The management decided that the foundation should sell the house and the 7⅓ acres so that it would have sufficient funds to continue its work.

In the early part of 1964, P.R.F. sold the house and 7⅓ acres to Craig Yacoe, Dan Friel, and Ed Ghee for $136,000. Under the terms

of the sale, P.R.F. had to vacate the premises and remove all its property contained therein within a month. Prior to the sale of the house and real estate, the management of P.R.F. had not taken any steps to sell the tangible personal property because it did not anticipate any problem in selling it.

After contracting to sell the house and realty, the foundation contacted an auctioneer in Philadelphia to inquire about disposing of the house's contents. The auctioneer indicated that substantial cost would be involved to box the property, transport it to Philadelphia, put it in storage, catalog it, and finally sell it. The foundation's management did not think that it should assume such an obligation. Because of the need to vacate within a month, the management also felt that there was insufficient time for the foundation itself to auction the property from the premises. The foundation's management then decided that it had no alternative but to sell the personal property for the highest amount that could be obtained.

Yacoe, Friel, and Ghee inquired whether the contents of the house were also for sale and P.R.F. indicated that they were. In February 1964, P.R.F. sold them the property for $8,300. The management of P.R.F. considered such price far from adequate but felt it had to accept since the sale was in a distress situation.

In determining what to offer for the contents of the house, Yacoe, Friel, and Ghee relied on their own judgment and the opinions of Edward Fogg and Arthur Thomas Dobbs which they had solicited. Yacoe asked Fogg and Dobbs each to inspect the contents of the house and give an opinion as to the value of the contents on a job-lot basis.

Dobbs operated a store in Wilmington which sold books and antiques. He was known to Yacoe as an appraiser and was advertised as such in the telephone directory. Yacoe accompanied Dobbs to the house where Dobbs had a quick look at the contents and gave his opinion that they were worth $7,500.

Fogg operated as a sideline an antique business that resulted from a "slightly overgrown hobby." He was not an expert in this field. Accompanied by Yacoe, he made a tour of the house and scanned its contents. Fogg told Yacoe that $6,900 would be an amount which he could offer for the property to begin negotiating.

Within a short time after they had purchased the contents of the house, Yacoe, Friel, and Ghee sold a portion of the property to petitioner's two children for $16,600. They sold another portion to friends for about $2,500. They sold another portion at public auction for a gross return of $5,752 (and a net of about $2,300). Yacoe, Friel, and Ghee kept for themselves the remainder of the property which they estimated to be about 10 percent of the total property.

On her individual Federal income tax returns for the taxable years 1961 and 1962 petitioner claimed charitable donations of $22,245 and $36,163, respectively, on account of the above-described contributions to P.R.F.

In the notice of deficiency, respondent determined that it had not been established that the fair market value of the property donated in the years 1961 and 1962 exceeded $3,420 and $5,580, respectively.

The fair market value of the above property donated by petitioner to P.R.F. in 1961 was $22,245 and the fair market value of the property donated in 1962 was $36,163.

OPINION

The first issue presented for decision in this case is whether certain expenditures made by petitioner for various workings in a mine leased by her are deductible as development expenditures under section 616 of the Internal Revenue Code of 1954,[1] or are exploration expenditures under section 615 which must be capitalized, as determined by the respondent.

Section 616, as effective for 1960, 1961, and 1962, provided in part as follows:

DEVELOPMENT EXPENDITURES.

(a) IN GENERAL.—Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. * * *

Section 615 provided in part as follows:

EXPLORATION EXPENDITURES.

(a) IN GENERAL.—In the case of expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred before the beginning of the development stage of the mine or deposit, there shall be allowed as a deduction in computing taxable income so much of such expenditures as does not exceed $100,000. This section shall apply only with respect to the amount of such expenditures which, but for this section, would not be allowable as a deduction for the taxable year. * * *

*     *     *     *     *     *     *

(c) LIMITATION.—
(1) IN GENERAL.—This section shall not apply to any amount paid or incurred to the extent that it would, when added to the amounts which have been deducted under subsection (a) and the amounts which have been treated as deferred expenses under subsection (b), or the corresponding provisions of prior law, exceed $400,000.

---

[1] All references are to the Internal Revenue Code of 1954 as effective for the taxable years 1960, 1961, and 1962.

In order for the expenditures to be deductible under section 616(a) two conditions must be met. First, the mine must have reached the development stage; and second, the expenditures must be for the development of the mine. The parties are in agreement that the mine was in the development stage during the years in question. Their dispute resolves itself into the question of whether the expenditures in question were for development within the meaning of section 616(a) or were for exploration.

The parties are in agreement that the form of a particular working (e.g., a diamond drill hole as contrasted to a drift) is not determinative of whether it should be classed as an exploration expenditure or a development expenditure since a given type working may be for either exploration or development depending on the circumstances.

The term development of a mine is not defined in the Code. Nor do the Income Tax Regulations under section 616 and 615 clearly define the terms "development expenditures" and "exploration expenditures," doing little more than paraphrasing the statute. See secs. 1.616–1(a) and 1.615–1(a), Income Tax Regs.[2]

On brief, respondent argues that the distinction between exploration expenses and development expenses is well understood in the mining industry. He states that exploration is considered to be the ascertainment of the existence, location, extent, or quality of commercial ore bodies and that development is considered to be the work after discovery and preparatory to extracting such ores. He further contends that such meaning was employed by Congress in the Revenue Act of 1951 in enacting the predecessors of sections 615 and 616.

Respondent further states the issue to be the extent to which the specific expenditures during the years in issue were preparatory to the actual extraction of ore rather than expenditures for the location of new commercial ore bodies. He admits that each of the disallowed expenditures related to the following of certain indicators as to the ex-

---

[2] Sec. 1.616–1(a) provides in part as follows:

*General rule.* Section 616 prescribes rules for treating expenditures paid or incurred during the taxable year by the taxpayer for the development of a mine or other natural deposit (other than an oil or gas well). Development expenditures under section 616 are those which are made after such time, when in consideration of all the facts and circumstances (including actions of the taxpayer), deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer. * * *

Sec. 1.615–1(a) provides in part as follows:

*General rule.* Section 615 prescribes rules for the treatment of expenditures for ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral (other than oil or gas) paid or incurred by the taxpayer before the beginning of the development stage of the mine or other natural deposit. The development stage of the mine or other natural deposit will be deemed to begin at the time when, in consideration of all the facts and circumstances (including the actions of the taxpayer), deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer. Such expenditures hereinafter in the regulations under section 615 will be referred to as exploration expenditures. * * *

istence of mineralization, but contends that they were not to prepare known commercial ore bodies for extraction, and hence were not development expenses. He contends that the expenditures were exploratory because the mine's geologist was relying upon inferences from geological factors. He further contends that to qualify as a development expense, an expenditure must be pertinent to preparing an area for the extraction of ore and the ore must be known to be present in sufficient quantity and quality as to be marketable. He concludes that the particular workings in the instant case were not so related but were, rather, incident to looking for ore, following leads, and not relative to a known commercial ore body.

Respondent has conceded that there were two known commercial ore bodies in existence, one at the 3,400 area and one at the 8,200 area, and that the development stage of the mine had been reached. However, he argues that the evidence establishes that the disputed expenditures were not for the purpose of preparing such known ore bodies for extraction, but were for the purpose of ascertaining the extent or quality of the bodies or the existence of other ore bodies. He states on brief:

As long as the working is in search for a new ore body, be it a geological extension of a known body or not, or as long as it is directed to determining the extent and quality of a known ore body, it must fall within the ambit of section 615.

Subsequent to the filing of the briefs herein, the respondent in a series of three revenue rulings, adopted a more liberal view of what constitutes deductible development expenditures than was taken on brief herein. See Rev. Ruls. 70–287, 70–288, and 70–289, 1970–1 C.B. 146–147. In those rulings the position was taken that, once it was ascertained that there existed an ore deposit of sufficient quality and quantity to justify commercial exploitation, expenses for core drilling (or any other means utilized) to further delineate the extent of and location of the commercially marketable ore reserves are development expenses within the meaning of section 616(a), and not exploration expenditures within the meaning of section 615(a), whereas costs of drilling from a developed mine for doing exploration work for a new and different ore deposit constitutes an exploratory expenditure within the meaning of section 615(a).

We think the position taken in the revenue rulings constitutes a reasonable interpretation of the statute. We have examined the congressional committee reports [3] with respect to sections 309 and 342 of the Revenue Act of 1951, which added section 23 (cc) and (ff) to the Internal Revenue Code of 1939, which latter sections are the pred-

---

[3] H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 357 ; S. Rept. No. 781, parts 1 and 2, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 545.

ecessors of sections 616 and 615 of the 1954 Code with which we are here concerned, and find nothing therein contrary to the above interpretation. It seems apparent that Congress sought to encourage the development of mineral resources once a commercial ore body had been discovered, and we think it reasonable to conclude that it intended to allow as deductions all expenditures reasonably connected with preparations for extracting the ore, including expenditures to further delineate more exactly the location and extent of that particular ore body.[4]

It should be added that comments made by the Senate Finance Committee in its report on the Tax Reform Act of 1969,[5] relative to the particular sections with which we are concerned, support the above conclusion. While expressions of a subsequent Congress are not controlling as to the meaning of prior enactments, they may properly be

---

[4] We have examined 1 Peele, Mining Engineers' Handbook (3d ed., 1941), an authority referred to by both parties herein, which seems to indicate that within the mining industry itself there is considerable doubt as to the precise characterization of expenditures as between "exploration" and "development." Such authority at 10–03 and 10–81 contains the following:

### 1. DEFINITIONS

\*     \*     \*     \*     \*     \*     \*

Exploration, or the work of exploring a mineral deposit when found. It is undertaken to gain knowledge of the size, shape, position, characteristics, and value of the deposit.
Development, or the driving of openings to and in a proved deposit, for mining and handling the product economically.

\*     \*     \*     \*     \*     \*     \*

These terms are used loosely. It is often difficult to distinguish between prospecting and exploration, or between exploration and development, as the different kinds of work insensibly shade into one another; an arbitrary differentiation between them is usually established at a given property. Confusion also arises when the terms are extended to describe operations on a property containing several orebodies. In such cases, prospecting for new orebodies is a part of exploration.

### DEVELOPMENT

#### 14. GENERAL

Systematic development. Purposes: (*a*) to provide openings for stoping and transporting mineral; (*b*) to obtain further and more detailed information as to character and size of orebody. Relative importance of these functions depends on type and size of orebody; the second is more important in orebodies of irregular shape and tenor, and in general during early stages of development. \* \* \*

[5] S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 542, contains the following:

"The treatment of expenditures which are incurred during the development or producing stage of a mine also is of concern to the committee. As indicated above, under present law, mineral exploration expenditures are currently deductible but subject to recapture, if they are incurred prior to the development stage of a mine. Expenditures incurred after the development stage of a mine has been reached also are currently deductible, either as development expenditures or operating expenses, but are not subject to recapture. It appears clear to the committee that Congress in enacting these provisions of law intended that exploration type expenditures during the development or producing stage of a mine would be treated as deductible development expenditures or operating expenses (except where the expenditures were made to discover a new mine), rather than as exploration expenditures. The Revenue Service, however, apparently supported by one circuit court

Footnote continued on following page.

considered in construing such meaning. See *Estate of Harrison P. Shedd*, 23 T.C. 41, affd. (C.A. 9) 237 F. 2d 345, and *Estate of John G. Stoll*, 38 T.C. 223, and cases cited therein.

We have considered the case of *Santa Fe Pacific Railroad Co.* v. *United States*, (C.A. 7, 1967) 378 F. 2d 72, affirming (N.D. Ill.) 254 F. Supp. 455, referred to in the above committee report, but do not view that case as being in conflict with our views expressed above. While that case held that not all expenditures incurred after the development stage of a mine has been reached are deductible development expenditures, it did not purport to fully define what expenditures made after such stage had been reached would constitute deductible development expenditures and which expenditures would constitute nondeductible exploration expenditures. It should be pointed out that in that case the taxpayer, on appeal, conceded that the expenditures in question constituted exploration expenses, contending only that *all* expenditures after the development stage had been reached are deductible as development expenditures.

The question here narrows to largely a question of fact as to whether the disallowed expenditures were made for the purpose of further delineating the location and extent of the two known commercially marketable ore bodies. We have carefully examined the testimony and other evidence adduced and have described in some detail in the Findings of Fact the nature and purpose of each particular working and the geological factors upon which it was based. We are satisfied that each expenditure, with the one exception which petitioner specifically concedes to have been an exploratory expenditure, was for the purpose of further delineating the location and extent of the known ore bodies,

---

Footnote continued from previous page.

case (*Santa Fe Pacific Railroad Co.* v. *United States*, 378 F. 2d 72 (7th Cir.)), has at times taken the view that these expenditures are not to be treated as development or operating expenses, but rather are to be considered exploration expenditures which must be capitalized since they are incurred after the development stage of the mine has been reached.

"The committee believes that Congress intended to allow the deduction of *all* expenditures incurred by a taxpayer in bringing a mine into production, either as exploration expenditures during the exploration stage or as development expenditures or operating expenses during the development and production stages. In other words, under present law and under the revisions of present law contained in the committee amendments, expenditures on a mine after the development stage has been reached are to be treated as deductible development expenditures or operating expenses, unless the expenditures are made for the purpose of discovering a new mine. This is, if a mine is in the development or production stage, exploratory expenditures (drilling, crosscutting, etc.) to determine the location, extent, or quality of a known deposit in the mine, or to locate or find other veins of ore in the mine, are deductible without recapture. However, if the exploration project is for the discovery of a new mine, even though conducted from underground workings of an existing mine, the expenditures would be subject to section 617. For example, if the operator of an existing mine enters into an agreement with the owner of adjacent land to drive crosscuts from the bottom of the existing mine into the adjacent lands to find out whether there are deposits of ore which would 'make a mine,' the exploration expenditures would be subject to section 617 even though the agreement provides that the operator of the existing mine, if the exploration project is successful, will have a share in the new mine when it is developed."

and was not for the purpose of exploring for new ore bodies.[6]

It is apparent from the evidence in this case that the deposition of ore bodies involves complex geological processes and that ore bodies are often of irregular shapes and sizes and varying degrees of continuity. The mine's geologist testified, in effect, that each of the questioned workings, with one exception, was undertaken, upon the basis of favorable geological indications, for the purpose of further delineating a particular occurrence of ore of the known ore bodies or attempting to follow an extension of one of the ore bodies or to locate a projected continuation of one of them, and that it was desirable to do such work in the mine before the actual process of extracting the ore began.

In view of the foregoing, we hold that all expenditures in question, except the one conceded by petitioner to be unrelated to the ore bodies present in the mine, are deductible development expenditures under section 616(a).

The second issue presented for decision in this case is the fair market value of certain tangible personal property donated by petitioner to a charitable organization in 1961 and 1962. Value is a question of fact to be resolved upon a consideration of all the evidence. *Daniel S. McGuire*, 44 T.C. 801.

Before donating the property, petitioner obtained an appraisal of the value of the property, upon which she relies to establish the fair market value of the property. The appraisal was made by two experts who made a thorough examination of the property and agreed that the fair market value of the property donated in 1961 and 1962 was $22,245 and $36,163, respectively. Each of them testified that these values represented the amounts that they, in their businesses of buying and selling property, would have paid for the property with a view to reselling it at a profit. We have carefully examined their testimony and are persuaded that their opinion represents the fair market value of the property at the times of its donation in 1961 and 1962.

Respondent seeks to counter the above by evidence of the sale of the property by the charitable organization in 1964 for $8,300. The charity was not under the control of petitioner when it sold the property. It did not undertake to sell the property until it had only 30 days in which to vacate its premises. The management of the charity had given insufficient consideration to the difficulties of disposing of the property and discovered that it was impossible to arrange for an auction of it. The management then decided to dispose of the property to any available purchaser at the highest price obtainable. Under the circumstances, we do not think that such sale, which was a

---

[6] One of the expenditures which the respondent disallowed was an expenditure for a drift which was claimed to have been driven to provide an escapeway. From the evidence we are satisfied that such was the purpose of driving the drift and that it should be considered a development expenditure.

forced sale, is indicative of value. See *Daniel S. McGuire, supra.*

We have also concluded that the purchasers' resale of the bulk of the property shortly after its purchase for an amount of about $25,000 is not indicative of the fair market value of the property at the time of donation. The purchasers were not experienced in dealing with property of this kind and quickly disposed of most of it to friends and to petitioner's children, retaining a portion for themselves.

Respondent further seeks to bolster his contention by reference to two opinions as to value solicited by the purchasers of the property in 1964. Arthur Thomas Dobbs valued the property at $7,500 and Edward Fogg valued it at $6,900. Dobbs is deceased. There is no evidence as to his qualifications or how he arrived at his opinion as to value. Fogg testified but admitted that he was not an expert and offered his opinion only as a beginning point from which the purchasers should negotiate. Under the circumstances, we are unable to ascribe any weight to their opinions.

Based upon a consideration of all the evidence, we have concluded that petitioner's expert appraisal establishes the fair market value of the property at the times donated and have found as a fact that the fair market value of the property donated in 1961 was $22,245 and that the fair market value of the property donated in 1962 was $36,163.

*Decision will be entered under Rule 50.*