ESTATE OF HATTIE STARKE RATCLIFFE, DECEASED, LOUIS G. RATCLIFFE, JR., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ratcliffe v. Commissioner
Docket No. 3464-90
United States Tax Court
T.C. Memo 1992-305; 1992 Tax Ct. Memo LEXIS 326; 63 T.C.M. (CCH) 3068; May 27, 1992, Filed *326 Decision will be entered under Rule 155. Charles E. Johnson and Neill G. McBryde, for petitioner. James E. Gray, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $ 997,062 in decedent's Federal estate tax and a $ 214,733 valuation understatement addition to tax under section 6660. After concessions by the parties, the issues for decision are the values of three parcels of real estate in Charlotte, North Carolina, on the date of decedent's death. Respondent conceded the section 6660 addition to tax. All section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner is the Estate of Hattie Starke Ratcliffe (decedent). Decedent was a resident of Charlotte, North Carolina, when she died on May 5, 1986. Louis G. Ratcliffe, Jr. (executor), is the duly qualified executor of decedent's estate. On February 26, 1990, the date the petition in this case was filed, the executor resided in Charlotte, North *327 Carolina. The executor timely filed decedent's United States Estate Tax Return (Form 706). For preparation of the Form 706, the executor retained Jack Starnes, a licensed real estate broker in North Carolina, to render an opinion of the fair market value of the three real estate parcels as of the date of decedent's death. The property descriptions, the values reported on Schedule A of the Form 706, and the values determined by respondent in her notice of deficiency are as follows: Reported
Value Determined in
Property Description
Value
Notice of Deficiency
Schedule A, Item 1, Tract I $   97,700
$ 1,095,000
(15.21 acres of vacant land)
Schedule A, Item 2, Tract II
763,750
1,020,000
(101.89 acres of land with
a single family frame dwelling
thereon)
Schedule A, Item 3, Tract III
146,150
765,000
(18.53 acres of vacant land)
Total
$ 1,007,600
$ 2,880,000
At the trial, however, respondent conceded the values determined in the notice of deficiency in favor of the report and testimony of her qualified expert witness, Thomas B. Harris, Jr., MAI, SRPA (Mr. Harris). Petitioner's qualified expert, Harry G. Brown, MAI, SPRA (Mr. Brown), also rendered an *328 opinion at trial as to the values of the three parcels of land that was different from the values first submitted on the Form 706. The values determined by the parties' experts are as follows: Petitioner's
Respondent's
Expert
Expert
Tract I
$  106,500
$  600,000
Tract II
790,000
968,000
Tract III
126,000
185,000
Total
$ 1,022,500
$ 1,753,000
All three parcels were acquired by decedent following the death of her husband in 1961. All three parcels are unimproved land located outside the city limits of Charlotte, North Carolina, in Mecklenburg County, approximately 10 miles from the Charlotte central business district. At the date of decedent's death, the area in which the parcels were located was primarily vacant acreage sites. To the west of the three parcels, on W. T. Harris Boulevard, were two residential developments. To the east of the three parcels a significant amount of land was devoted to: (1) The University of North Carolina -- Charlotte; (2) University Research Park, which housed such commercial tenants as International Business Machines, Allstate Insurance Company, AT&T, The Wall Street Journal, and others; and (3) University Place, a planned *329 multiuse development, which included residential, office, and retail facilities. Tract I is a 15.21-acre tract with 1558.99 feet of road frontage on the east side of W. T. Harris Boulevard West. W. T. Harris Boulevard West is a controlled access road for the entire length of this frontage. The southern boundary of Tract I, measuring approximately 160 feet, is adjacent to an access road from W. T. Harris Boulevard. Access to Tract I from W. T. Harris Boulevard is via this 160-foot frontage. Tract I carried an R-12 zoning classification on the date of decedent's death. Under the zoning ordinance for Mecklenburg County, North Carolina, in effect on the date of decedent's death and currently in effect, an R-12 zoning classification allows the construction of single family homes on lots at least 12,000 square feet in size. Tract II is a 101.89-acre tract with approximately 1,700 feet of road frontage on the west side of W. T. Harris Boulevard West. W. T. Harris Boulevard West is a controlled access road for the entire length of this frontage except for a 60-foot access located in the southeast corner of Tract II. On the date of decedent's death, the vast majority of Tract II had *330 a zoning classification of R-12 CD, while a very small portion of the tract had a zoning classification of R-12MF CD, which was to be dedicated greenway, owned by the county, and not to be developed. Under the Mecklenburg County zoning ordinance then and still in effect, the "CD" designation is an acronym for "conditional use district", which means that the Mecklenburg County Board of Commissioners (the Board) attaches certain conditions to the approval of the zoning classification which are binding on the property. Tract II was one of a number of parcels of land assembled by the Walsh Corporation in July 1985 at an option price of $ 20,000 per acre. The Walsh Corporation paid various option prices to different owners for their tracts of land. On March 17, 1986, the Walsh Corporation received approval from the board for a mixed-use development plan, which consisted of a mix of single family, multifamily, and business commercial development. The plan called for development of approximately 400 acres of land on or in the vicinity of W. T. Harris Boulevard West. However, the Walsh Corporation never developed the properties, and on February 15, 1988, the Board approved the petition *331 of the executor, on behalf of decedent, to rezone Tract II to a zoning classification of R-12. Tract III is an 18.53-acre tract with approximately 940 feet of road frontage on Mallard Creek Road, west of W. T. Harris Boulevard West, and also road frontage on Baucom Road, a State-maintained gravel road lying on the tract's eastern boundary. Tract III was zoned R-12 at the date of decedent's death. Tract III was the only one of the three tracts without sewer access at the date of decedent's death. OPINION The value of property included in a decedent's gross estate is based on the fair market value of the property as of the date of death. Section 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The valuation of property is a factual issue which turns on all the relevant evidence. Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971). *332 The matter of valuation is a subjective one and requires the exercise of our best judgment under all the circumstances. Messing v. Commissioner, 48 T.C. 502, 512 (1967). The parties have relied upon the opinions of various experts in the real estate field to determine the values of the three parcels of land. Petitioner, in addition to the appraisal obtained by Mr. Starnes and submitted with the Form 706, obtained opinions from Mr. Brown and John J. Locke, MAI (Mr. Locke). However, Mr. Locke rendered his opinion only as to the highest and best use of Tract I. The parties stipulated to the qualifications as expert witnesses of Mr. Brown, Mr. Locke, and respondent's expert, Mr. Harris. Throughout this opinion when we refer to the parties' experts, we will be referring to Mr. Brown and to Mr. Harris. The experts valued the property by using the "comparable sales" approach. This approach involves gathering information on sales of property similar to the subject property, then comparing and weighing them to reach a value for the land being appraised. In the case of unimproved land, such as in the instant case, the comparable sales approach is generally the *333 most reliable. Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977). The experts also conducted a highest and best use analysis as part of their appraisal processes. This analysis attempts to determine the value of land based on its most profitable and legally permissible use as of the date of the appraisal. A. Tract I
The parties disagree as to the fair market value as well as the highest and best use of Tract I. Respondent determined that the highest and best use of Tract I as of the date of decedent's death was for multifamily residential development. Respondent's expert considered the physical characteristics of the property, the financial feasibility of developing multifamily residences, and the zoning designations for neighboring properties. He met with local real estate brokers and employees of the Urban Institute at the University of North Carolina-Charlotte and the Charlotte/Mecklenburg Planning Commission to ascertain any general development trends and the political environment for rezoning. He concluded that a successful rezoning of Tract I was reasonably foreseeable *334 on the date of decedent's death. Accordingly, the comparables used by respondent's expert to determine the fair market value of Tract I were all zoned for multifamily residential use. Petitioner contends that the highest and best use of Tract I was for single family residential development, for which it was zoned at the date of decedent's death and at the time of trial. The comparables used by petitioner's expert were zoned for single family residential use. As we stated at trial, both experts were competent, qualified, and persuasive in presenting their opinions. However we are not persuaded by Mr. Harris' opinion that on the date of decedent's death, it was reasonably foreseeable that Tract I could have been rezoned to permit multifamily residential development. We note that the zoning process takes into consideration the demands of neighborhood groups, an ever changing political climate, developers' persuasiveness and financial ability, whims and concerns of Board members, and long-term economic and social goals of a community. We find that the rezoning of Tract I was speculative at the time of decedent's death. Accordingly, we find Mr. Harris' analysis under the comparable *335 sales approach to be of no probative value in making our determination of the fair market value of Tract I, as the comparables he used were all zoned for multifamily residential use. We therefore find that on May 5, 1986, the fair market value of Tract I was $ 106,500, as determined by petitioner's expert, Mr. Brown B. Tract II
The parties agree that the highest and best use for Tract II is for single family residential development; they differ in opinion only as to the value. The experts compared the sales of properties similar to Tract II, which were sold at or near the date of decedent's death. Mr. Brown compared the sales of four properties. Mr. Harris compared the sales of six properties, four of which were the same properties used by Mr. Brown. They made various adjustments to the sales prices to balance the dissimilarities between these comparables and Tract II. Mr. Brown took the median value of all sales to arrive at a value for Tract II. Mr. Harris reviewed the range of values and placed a greater emphasis on the one particular property that was most similar to Tract II in arriving at his value. "We think it would serve no useful purpose to review the evidence *336 in detail, to indicate our agreement or disagreement with each of the experts' opinions and the factors which they weighed in reaching their conclusions or to meticulously record the factors which we considered or the weight accorded each of them, in arriving at our determination of value." Estate of Rabe v. Commissioner, T.C. Memo. 1975-26. However, some general comments are necessary. The differences in the experts' values arose because of differences in adjustments they made to the comparable properties. For example, both experts compared the sale of a 122-acre tract of land on August 26, 1986, for $ 1,006,761. Respondent's expert stated in his report, "This sale was adjusted downward one percent for time and was also adjusted upward five percent for an inferior zoning classification." This resulted in a net adjustment to the actual sales price upward 4 percent. Petitioner's expert adjusted the sales price downward 2 percent for the time of sale; upward 10 percent for the location of the property; downward 5 percent for the topography of the property; and downward 10 percent because the property had considerable road frontage or access, which would minimize *337 potential development costs of the property. The adjustments by petitioner's expert resulted in a net adjustment to the actual sales price downward 7 percent. Both experts also compared the sale of a 49-acre tract of land on November 24, 1986, for $ 485,500. Respondent's expert adjusted the sales price downward 2 percent for the date of sale; downward 10 percent for size; and upward 5 percent for a zoning classification inferior to Tract II. This resulted in a net adjustment to the sales price downward 7 percent. Petitioner's expert adjusted the sales price downward 6 percent for the time of sale; downward 10 percent for size; upward 10 percent for lack of various utilities; and downward 10 percent for the considerable amount of road frontage or access. These adjustments resulted in a net adjustment to the sales price downward 16 percent. The appraisals were detailed and complete. Their computations of value differed because they attached varying degrees of importance to different factors. However, since valuation is a matter of opinion, it is not determinable with talismanic precision. We do not find the evidence of valuation by one expert sufficiently more convincing than *338 that of the other; and we find on this record that on May 5, 1986, the fair market value of Tract II was $ 869,500. C. Tract III
The parties also agree that the highest and best use for Tract III is for single family residential development; they differ in opinion only as to the value. The experts compared sales of properties similar to Tract III, which were sold at or near the date of decedent's death. Mr. Harris compared the sales of five properties. Mr. Brown compared the sales of four properties, three of which were the same properties used by Mr. Harris. They made various adjustments to the sales prices to balance the dissimilarities between these comparables and Tract III. Mr. Brown then took the median value of all sales to arrive at a value for Tract III. Mr. Harris examined all five sales but placed a greater emphasis on the sales of two properties that he believed were more similar to Tract III in arriving at his value. The parties agree that Tract III had no sewer connection as of the date of decedent's death. They also agree that lack of a sewer connection is detrimental to property whose highest and best use is for single family residential use, and that *339 the cost of connecting sewer lines could be considerable. Mr. Brown testified that as of the date of decedent's death, the nearest public sewer connection was almost 2,500 feet away from Tract III and that construction of this amount of sewer line would cost approximately $ 30 per foot. The comparable properties that the experts used to determine a value for Tract III all had sewer connections (except for one property used by Mr. Brown, which had no sewer at the time of sale, but the buyer was aware that sewer connection was imminent). Therefore, Mr. Brown adjusted the sales price of the three properties with sewer connection downward 25 percent, and the sales price of the one property in which a sewer connection was imminent, downward 5 percent. However, Mr. Harris adjusted the sales price of one property downward 5 percent and made no adjustment to the sales price of the other property relied upon by him. As the Court repeatedly admonished counsel at trial, this issue of valuation is more properly suited for discussion and compromise between the parties. However, once again the Court has been called upon to resolve a matter best left to the local real estate experts. Both *340 experts provided convincing evidence of Tract III's value; however, we think that Mr. Harris' omission of proper adjustments to sales prices of his comparables for lack of sewer connection makes Mr. Brown's value more persuasive. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441 (1980). An accurate value of Tract III must reflect the considerable cost of extending a sewer line to the property. Therefore, we find that on May 5, 1986, the fair market value of Tract III was $ 126,000, as determined by Mr. Brown. Decision will be entered under Rule 155.